UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
GEORGE WILSON,

                            Petitioner,              REPORT AND
                                                     RECOMMENDATION
     -against-                                   01 CV 2246 (DGT) (RML)

WILLIAM MAZZUCA, Superintendent,
Fishkill Correctional Facility,

                            Respondent.
--------------------------------------------------------------X
A P P E A R A N C E S :

     For the Petitioner:
          DEBEVOISE & PLIMPTON LLP
          919 Third Avenue
          New York, N.Y. 10022
          BY:   ERIK BIERBAUER, ESQ.
                 JOHN LAUFER, ESQ.

     For the Respondent:
          ELLIOT SPITZER, ATTORNEY GENERAL OF THE STATE OF NEW YORK
          120 Broadway
          New York, N.Y. 10271
          BY:   ROBIN FORSHAW, ESQ.
                 BETH THOMAS, ESQ.
                 MONA JHA, ESQ.
                 NISHA DESAI, ESQ.

LEVY, United States Magistrate Judge:

        Petitioner George Wilson ("petitioner" or "Wilson") brings this action pursuant to

28 U.S.C. § 2254 for a writ of habeas corpus.  On April 9, 2001, Wilson filed a pro se habeas

petition in the Eastern District of New York.  On May 27, 2003, the Honorable David G. Trager,

United States District Judge, adopted this court's January 17, 2003 Report and Recommendation

("R&R") denying Wilson's petition.  On January 22, 2004, the Second Circuit granted Wilson a

certificate of appealability to consider his claim of ineffective assistance of counsel.  On January

5, 2005, the Second Circuit vacated the district court's judgment and ordered a hearing. A hearing took place before me on July 13, 2005. Post-hearing briefing was completed on October 31, 2005. For the reasons stated below, I respectfully recommend that the petition be granted.

## BACKGROUND AND FACTS

On December 22, 1992, two men robbed Erra Sheet & Metal, a scrap-metal business in Astoria, Queens. In the course of the robbery, the two men ("Robber One" and "Robber Two") entered the office of Roger Erra ("Erra"), the shop's owner and manager, and confronted Erra and John Lucas ("Lucas"), one of Erra's employees. Robber Two held a gun to Lucas's head and demanded money. (Affidavit of Mona Jha, Esq., sworn to July 31, 2001 ("Jha Aff."), ¶ 5; Trial Transcript ("Tr.") at 412, 417, 422-23, 425, 473.) Erra removed some money from his desk drawer and gave it to Robber One, who then demanded more. (Jha Aff. ¶ 5; Tr. at 425-26.)

When Erra said he had no more money, the robbers pushed Erra and Lucas into the bathroom and locked the door. (Jha Aff. ¶ 6; Tr. at 428-29.) While inside the bathroom, Erra heard the robbers rummaging through the office. (Jha Aff. ¶ 6; Tr. at 429.) After the robbers left, Erra and Lucas broke down the bathroom door and called the police. (Tr. at 429-30.) That same day, Erra went to the 114th precinct, where he provided a description of the robbers (id. at 432-34) and was shown a photo book with mug shots from which he identified the petitioner as Robber One. (Id. at 529-30, 532.)

The investigation apparently lay dormant until 1994, when Wilson was arrested on unrelated charges after unlawfully entering a construction site, as part of a purported protest, with other men who were allegedly armed with metal pipes. After a background check revealed

that he was a suspect in the 1992 robbery, Wilson was placed in a lineup, at which Erra identified him as Robber One. (Id. at 444-45, 636, 645.) On October 28, 1994, Wilson was arrested and charged with Robbery in the First Degree (N.Y. Penal Law § 160.15[4]) and Robbery in the Second Degree (N.Y. Penal Law § 170.10[1]). (Jha Aff. ¶ 8.)

Wilson's trial was held in September and October of 1995 before Queens County Supreme Court Justice Charles A. LaTorella ("Justice LaTorella" or the "judge"). The prosecution's case consisted of the eyewitness identification of a single witness, Roger Erra. There was no physical evidence linking Wilson to the crime, and there were no inculpatory statements. The only admissible pre-trial identification was the lineup held two years after the robbery. In his testimony, Erra identified Wilson as Robber One. He testified that, in 1992, he observed the robbers for approximately ten minutes, at times from close range, that his office was well lit, and that he picked Wilson out of a lineup in 1994. (Tr. at 419-20, 423-29, 434, 444-45.) Erra also testified that he had never seen the perpetrators before the robbery. (Id. at 469.)

The prosecution's case was then strengthened as a result of testimony elicited by Wilson's trial counsel, Francis GaNun ("GaNun"). For example, the People were allowed to introduce evidence of Erra's contemporaneous identification of Wilson at a photo array conducted on the day of the robbery, after GaNun repeatedly questioned the adequacy of the police investigation. Similarly, the People were permitted to explore Wilson's prior criminal history after GaNun offered the testimony of a character witness.

The defense presented two alibi witnesses who gave somewhat conflicting testimony. Petitioner's father, James Wilson, testified that Wilson lived with him in the Astoria

Houses ("Astoria Projects") and that on December 23, 1992 he had told police officers who came to interview him that his son was working out of town and that he had not seen him in two or three days. (Id. at 837-40.) A second alibi witness, Joseph Isaac ("Isaac"), testified that he and Wilson were working in Pennsylvania on December 22, 1992 and that Isaac dropped Wilson off at Wilson's home, in the Astoria Projects, that night, as Isaac had every weeknight since November. (Id. at 914-15.) The defense also presented the testimony of Bernard Garrett, a witness who was arrested with Wilson at the construction site in Astoria in 1994, and of Carolyn Younger, who was deemed a character witness and whose testimony will be discussed below.

On October 4, 1995, the jury found petitioner guilty of Robbery in the Second Degree, and the court later sentenced him to seven and one-half to fifteen years in prison. (See Jha Aff. ¶ 8, Ex. B ¶ 3.) Petitioner's post-conviction proceedings are detailed in my previous R&R, dated January 17, 2003. On May 27, 2003, Judge Trager adopted this court's R&R denying Wilson's petition. On January 5, 2005, the Second Circuit vacated Judge Trager's decision denying the writ and remanded the case to this court for an evidentiary hearing "to afford Wilson's trial counsel the opportunity to explain his actions." Wilson v. Mazzuca, 119 Fed. Appx. 336, 337 (2d Cir. 2005).[1] The court stated that it was unable to assess whether strategic considerations accounted for certain acts or omissions by defense counsel "that had the effect of substantially strengthening the state's otherwise weak case." Id. Therefore, the court was "concern[ed] that a Strickland violation may have occurred . . . ." Id. at 338. The decision found that "'the record fail[ed] to suggest any plausible trial strategy' for at least some of the acts or omissions about which Wilson complain[ed]." Id. (quoting Eze v. Senkowski, 321 F.3d

---

[1] Wilson was represented by Sally Wasserman, Esq. in the Second Circuit.

110, 129 (2d Cir. 2003)). The court instructed the district court to hold a hearing to determine

whether defense counsel's "acts or omissions were indeed part of a sound trial strategy." Id. By

Order dated January 11, 2005, Judge Trager referred the petition to me for a hearing and Report

and Recommendation. I appointed pro bono counsel to represent Wilson and held a hearing on

July 13, 2005, at which GaNun was the sole witness. His testimony will be described below.

## DISCUSSION

I. Legal Standard

The Sixth Amendment to the U.S. Constitution provides that a criminal defendant

"shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend.

VI. This right to counsel is "the right to *effective* assistance of counsel." McMann v.

Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added). The Supreme Court has explained

that the purpose of the Sixth Amendment is "to ensure a fair trial" and therefore the "benchmark

for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the

proper functioning of the adversarial process that the trial cannot be relied on as having produced

a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). See also Kimmelman v.

Morrison, 477 U.S. 365, 374 (1986) ("[T]he essence of an ineffective-assistance claim is that

counsel's unprofessional errors so upset the adversarial balance between defense and prosecution

that the trial was rendered unfair and the verdict rendered suspect.").

It is well established that to prove a claim of ineffective assistance of counsel

Wilson must demonstrate that: (1) his counsel's performance was constitutionally deficient; and

(2) the deficient performance prejudiced his defense. Strickland, 466 U.S. at 687. With regard

to the first prong, the Supreme Court has stated that a petitioner must show that "counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  Id.

Under the second prong, petitioner must establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.  However, "[t]he result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  Id.  Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others.  See Eze, 321 F.3d at 112.

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," although strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Strickland, 466 U.S. at 690-91.  According to Strickland, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  However, the Second Circuit has recently held that, notwithstanding the obstacles of Strickland, "if certain [acts or] omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, we would find the quality of representation sufficiently deficient to grant the writ."  Eze, 321 F.3d at 112.

In his post-hearing brief, Wilson argues that his trial counsel was ineffective because: (1) despite numerous admonitions from the trial judge, he opened the door to evidence

of Wilson's prior criminal history through the use of a character witness; (2) he introduced into evidence at trial a police complaint report describing Wilson's 1994 arrest on unrelated criminal charges; (3) he opened the door to the admission of Erra's identification of Wilson as Robber One at a photo array held on the day of the robbery; (4) he failed to object to the prosecutor's use of the prejudicial terms "mug shot" and "mug books" and failed to seek redaction of Wilson's "mug shot" photo; and (5) he incompetently elicited testimony from Erra that he feared reprisals from Wilson. (<u>See</u> Memorandum of Law in Support of George Wilson's Petition for a Writ of Habeas Corpus, dated Aug. 31, 2005 ("Pet.'s Mem.").) The court will evaluate each of these allegations in turn.

II. <u>Strickland Analysis: Prong One</u>

    A. <u>Trial Counsel Opened the Door to Wilson's Criminal History by Presenting Character Testimony</u>

Wilson argues that defense counsel inadvertently opened the door to Wilson's criminal history by eliciting character testimony from defense witness Carolyn Younger. (Pet.'s Mem. at 3.) He contends that GaNun failed to comprehend what he had done despite repeated warnings from the judge, who offered him no fewer than five opportunities to strike Younger's testimony. (<u>Id.</u> at 3, 8.) The respondent William Mazzuca ("respondent" or "the State") asserts that GaNun made a conscious, tactical decision to introduce evidence of petitioner's good character even though he thereby opened the door to Wilson's criminal history. (<u>See</u> Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus, dated Oct. 14, 2005 ("Resp.'s Mem."), at 12.) Careful review of the trial transcript and GaNun's testimony at the July 13, 2005 evidentiary hearing ("the hearing") compels the conclusion that trial counsel's

actions were most likely the product of ineptitude, carelessness and lack of focus.  In no event were they part of a sound trial strategy.

At the time of trial, Wilson had a record of two convictions and an arrest on charges of assault and weapons possession.  (Tr. at 941, 948, 950, 957, 959.)  At a pre-trial Sandoval hearing, the trial judge ruled that, if Wilson took the stand, the prosecution's prior criminal history impeachment would be limited to a non-violent drug conviction.  However, the judge explicitly warned GaNun that "if there's a character witness who says [Wilson] is a very peaceful man . . . I won't preclude the use of [Wilson's prior] arrests and all the [police] reports and everything else [the D.A. has]. . . ."  (Tr. at 20-21.)

Wilson did not testify at trial.   However, during the trial, GaNun announced his intention to call Younger to testify about Wilson's visibility in the neighborhood where the robbery occurred.  Before Younger took the stand, the prosecutor told the judge that GaNun had advised him Younger would testify, among other things, that she had seen Wilson at civic association meetings and at church.  (Id. at 826-27.)  The judge pointedly warned GaNun that Younger's testimony would open the door to Wilson's criminal history if she testified about Wilson's reputation.  (Id. at 830.)[2]

_____

[2] According to Justice LaTorella:

> If Mr. GaNun does not ask about reputation in the community
> directly and as long as the evidence that [the D.A. has] mentioned
> that [GaNun] intends to bring in tends towards the first thing about
> what I said [community activities], then it's not character evidence,
> and if it isn't, [GaNun] hasn't opened the door.
>
> If and when Mr. GaNun asks about reputation in the community,
> then he knows he will have opened up the door and we'll see what

(continued...)

Nonetheless, under questioning from GaNun, Younger testified that Wilson was "a role model for young adults." (Id. at 930.) The prosecutor objected, and the judge asked GaNun if he wanted to strike her answer, as it went to Wilson's reputation. (Id.) GaNun responded, "I certainly don't. I know the D.A. does." (Id.) After GaNun declined the judge's first offer to strike Younger's "role model" testimony, the judge repeated the offer four times. (Id. at 930, 932, 933.) "For the record, it's not up to me to move to strike my own question," stated GaNun. (Id. at 933). GaNun's answer showed a complete lack of understanding of the judge's offer and of the potential harm the admission of Wilson's past criminal history could pose to Wilson's defense.

GaNun's confusion was further illustrated during the cross examination of Younger. When the prosecutor indicated he was going to ask Younger about Wilson's criminal history, the judge said "the door is open, counsel," to which GaNun responded, "I have no objection." (Id. at 941.) However, moments later GaNun reversed course and objected to the questioning. "First of all, your Honor, this defendant has not taken the stand," he protested. (Id. at 954.) GaNun seemed to assume that because Wilson had not testified, his prior criminal record would not come before the jury, confusing the court's Sandoval ruling with its ruling on

---

[2](...continued)
happens from there.

. . . .

But Mr. GaNun is fully warned as he knows, and I don't have to
tell him the jury knows, if he asks any witness what is [Wilson's]
reputation in the community, then it's character evidence, he opens
up the door. That's all.

(Tr. at 830-31.)

character testimony.  (Id.)  When the judge corrected him, GaNun insisted  "[Younger is] not a character witness . . . . The witness started to go off.  It was up to the District Attorney to object.  It wasn't up to me to object." [3]  (Id.)  Justice LaTorella then admonished GaNun and ruled that the door was open.[4]  At sentencing, GaNun still failed to understand what he had done and

---

[3]
> Counsel: First of all, your Honor, this defendant has not taken the stand, number one.
>
> The Court: I understand that.  But you put a character witness on.
>
> Counsel: Your Honor, it's not a character witness.  I asked the question and the question was what was his role in the community.  The witness started to go off.  It was up to the District Attorney to object.  It wasn't up to me to object.  Now, I didn't–
>
> The Court:  Excuse me, excuse me, Mr. GaNun, I'm sorry to say this to you, but not only was it up to you to object that she was going too far, I even gave you an opportunity.

(Tr. at 954).

[4] Justice LaTorella explained:

> Now, I had a thorough and complete discussion concerning character evidence and opening the doors and closing them.  As late as this afternoon.
>
> I warned you that if you offered character evidence, I would permit the door to be opened. . . .
>
> At that time, I even gave you an opportunity after the answer was completed, to have it stricken from the record, which was really much further than I had to go in order to save you from the prospect of having the door opened.
>
> I also reminded you [GaNun] of my previous rulings.  You did this with your eyes open, you had put on a character witness, the door is open.

(Tr. at 955.)

repeated his objection that Wilson's prior criminal record should not have been allowed because the defendant "never took the stand." (Sentencing Transcript, dated Nov. 15, 1995 at 11.) Apparently, GaNun mistakenly believed that Wilson's criminal history would come in only if Wilson testified. This displayed a fundamental misunderstanding of the law and of the court's ruling that character testimony would open the door to Wilson's entire criminal history.

At the evidentiary hearing, GaNun was unable to offer a coherent explanation of his strategy. His testimony was at times rambling, unfocused and inconsistent. There was little evidence that he appreciated the consequences of many of the key decisions he made at trial – either then or now. Most troubling were his poor judgment, lack of understanding of the law and near obsessive focus on side issues.[5]

When petitioner's counsel asked GaNun at the hearing what testimony he had intended to elicit from Younger, he first answered that he hoped to show that (1) Wilson was "innocent" and (2) Wilson was an activist who was visible in the community and thus might have been mistaken for the perpetrator. (Transcript of Civil Cause for an Evidentiary Hearing,

---

[5] Several times during the evidentiary hearing, GaNun noted that he and the trial judge had disagreements and were at odds throughout the trial. (See Transcript of Civil Cause for an Evidentiary Hearing, dated July 13, 2005 ("EH") at 26 ("I was having a problem with the judge that as you indicated, he interrupted and I had never appeared before him before and I never had the experience of the judge interfering . . . ."); EH at 33 (noting that he and the judge were "having a situation, a rolling argument with myself and the Court"); EH at 67 (GaNun stating that he did not want the numerical plate redacted because it "was another issue that we had with the Court"); EH at 76 (stating that the "judge made a terrible error"); EH at 93 (stating that the "judge made a terrible error"); EH at 94 (stating that "the judge, instead of listening or giving a decision, physically left the bench"); EH at 98 ("I did not have a good relationship with this particular judge who, unfortunately, passed away two months ago. So I really can't say more about him. It wouldn't be fair.").) Based on the trial transcript, it appears many of these disagreements occurred because the judge was alarmed by GaNun's errors. See Tr. at 505-08; 662-65; 673; 752-55; 955.

dated July 13, 2005 ("EH"), at 19-20.)

When asked whether it was his intention to elicit character evidence from Younger, GaNun stated, "[y]es, if it was going to be for [Wilson's] benefit, I would try to elicit [it]."  (Id. at 23.)  A few minutes later, the following exchange took place between petitioner's counsel and GaNun:

> Q:  Did you realize, Mr. GaNun, what it was that the Court was driving at when [the judge] asked you whether you wanted to strike that testimony?
>
> A:  No.
>
> Q:  Did you realize the judge was saying that this would open the door to Mr. Wilson's criminal record?
>
> A:  Probably.
>
> . . . .
>
> A: . . . I was having a situation where I was dealing with the prosecutor and I was dealing with the judge and I thought the judge was off base in the entire case. And he came down with the business of the – when a jury because of the reading of the testimony, that we couldn't give them the reading of the testimony, I thought the judge was in error.  And I always thought the judge was overbearing in criminal cases . . . .
>
> The Court: . . . I think the question you were asked was did you realize it would open the door to the defendant's criminal record.
>
> . . . .
>
> A: You see probably because I didn't have a position – my position with regards to the defendant Wilson was here's a guy who is accused of a crime.  The crime has taken place two years prior to him being arrested.  He was arrested because some detective in the 114th precinct had stuck in a wanted card.  The detective had

gone to Mr. Wilson's father and said where is George. And I think the situation was he was told – the detective was told by Mr. Wilson's father that I don't know where he is but I think he's in Pennsylvania doing some construction type of work. And that was the case. And I didn't think it warranted put[ting] in a wanted card without the detective doing any further work [in 1992]. And my position with Mr. Wilson was he was an innocent man and I didn't care what he had done wrong. We tried to show that, you know, he straightened out.

(Id. at 27-28.)

GaNun's explanation changed slightly after petitioner's counsel reminded him that he had told the judge Younger was "not a character witness." (Id. at 33) (quoting Tr. at 954.)[6] GaNun eventually conceded that he did not know "what she [Younger] was put on for . . . ." (EH at 34.)

Later in the hearing, when petitioner's counsel asked GaNun whether it was his "strategy to call Ms. Younger as a character witness," it was unclear whether GaNun understood

---

[6]

> Q: So, was Ms. Younger a character witness or was she not a character witness?
>
> A: Do I have to say right now what she was or what we expected her to be? We expected her to testify that she knew Mr. Wilson and that Mr. Wilson, as far as she was concerned, was a reputable person in the community. . . . And again, you're dealing with a jury and if anything is positive for your client, you try to get it in. Anything negative, you try to knock it out. If in doing so you have to take a position[,] that was the position we took.
>
> Q: So now you're testifying here today that [Younger] was put on as a character witness?
>
> A: I'm testifying that I don't know what she was put on for, you know?

(EH at 33-34.)

what a character witness was:

> A: My intention was to call her to show that somebody knew Mr.
> Wilson and her perspective of Mr. Wilson was a beneficial one to
> our case.  Now, if you [are] going to characterize it as a character
> witness, it would be a character witness but that's the way it came
> out [sic].

(Id. at 105.)  GaNun was then asked whether, in calling Younger to testify, it was part of his

strategy to open the door to Wilson's criminal record.  (Id. at 106.)  GaNun answered, "[n]o, I

would say I had no intention of doing that.  If it happened, it happened."  (Id.)  Most puzzling of

all, GaNun stated that it *was* part of his trial strategy to show that Wilson tried to rehabilitate

himself.  When petitioner's counsel questioned the logic of this strategy, GaNun surprisingly

acknowledged that "it was better to show that [Wilson] had committed crimes and rehabilitated

himself than it was to keep those crimes from coming out in the first place."  (Id. at 111.)

During questioning by respondent's counsel, GaNun was asked whether he was

"aware that if [GaNun] brought forth a character witness identifying Mr. Wilson as a 'peaceful

man,' the prosecution might be able to bring in evidence of his prior arrest."  (Id. at 79.)  GaNun

answered "[y]es."  (Id.)[7]  Respondent's counsel elicited that GaNun's strategy in calling Younger

was to show that Wilson was an African-American activist who had been seen around the

neighborhood; that Erra might have recognized Wilson through those activities; and that this was

a case of mistaken identification.  (Id. at 80.)[8]  When asked if Wilson was aware that his prior

---

[7] Respondent's counsel's questions were often leading and conclusory, and in effect
suggested the answer to GaNun.  Where those answers conflicted with answers GaNun had
previously given on direct examination, the court gave them lesser weight.

[8] The following exchange then occurred between GaNun and respondent's counsel:

(continued...)

crimes might be elicited by having Younger testify as a character witness, GaNun stated, "[w]ell, not directly but that came out."  (Id. at 83.)

As a result of Younger's reputation testimony, the jury heard that Wilson had been convicted of drug possession after being arrested with 28 packets of cocaine, had pled guilty to a violation after being charged with punching a woman in the face and taking her necklace, and had been arrested for menacing and criminal possession of a weapon.  (Tr. at 941, 948, 950, 957, 959.)  If the purpose of Younger's testimony was to show that Erra recognized

_____

[8](...continued)
> Q:  And you know, you knew that asking Ms. Younger about Mr. Wilson's activities as a role model for young adults in this community organization could possibly open the door to his prior criminal history.
>
> A:  Yes.
>
> . . . .
>
> Q:  It was worthwhile to you to call Carolyn as a witness.
>
> A:  In my defense of Mr. Wilson, as in any criminal defendant, if you can get a witness, any witness, to say that the guy is a good guy, it's worth putting him on.
>
> . . . .
>
> Q:  In your mind, putting that in evidence before the jury, did that outweigh any possible prejudice?
>
> A:  Well, it was consistent with our position.  Our position was he was an innocent man.  He never did it.
>
> Q: So, it was consistent with your defense strategy?
>
> A: . . . . If a fellow is arrested, obviously he's arrested.  So, many people – you can't hide that he's arrested, you know?

(EH at 81-83.)

Wilson because of his visibility in the community rather than his role in the robbery, GaNun could easily have furthered that goal without bringing in evidence of Wilson's reputation in the community.[9]  As Justice LaTorella painstakingly explained, Younger could freely testify about Wilson's community activities; Wilson's criminal history would come in only if she discussed his reputation.

While it may have been part of GaNun's trial strategy to show that Wilson was a model citizen, that strategy was poorly conceived, because GaNun failed to recognize that Younger's testimony would open the door to Wilson's criminal history.  GaNun did not, as respondent suggests, "fully consider[ ] the benefit gained from testimony that petitioner was a community 'role model' . . . ."  (Resp.'s Mem. at 14.)  As the record shows, GaNun was unable to weigh the prejudice that would inevitably result from the use of character testimony, because he did not comprehend the judge's warnings and blindly proceeded to open the door to Wilson's prior criminal history.[10]  If GaNun had fully considered this strategy, he would not have objected during the prosecution's cross examination of Younger and alleged that she was not a character witness.  (Tr. at 954.)  See Williams v. Taylor, 529 U.S. 362, 395 (2000) (noting that a decision

---

[9] In his summation, GaNun intended to suggest that Wilson's high visibility in the community after the robbery was inconsistent with the acts of a criminal who sought to conceal his identity.  However, he did not even use the "role model" testimony.  GaNun told the jury that Younger "testified that my client was a community nosebody, or whatever.  He got into everybody's business.  He was taking care of this, that and the other thing.  It's not the type of situation where he was hiding."  (Tr. at 1025.)

[10] Respondent argues that the inconsistencies and lack of knowledge GaNun displayed at the evidentiary hearing were the results of the passage of time and fading memories, rather than the lack of a sound and coherent trial strategy.  The court disagrees.  The trial transcript shows that GaNun had no better grasp of the court's legal rulings or the risks of presenting character testimony at the time of trial.

based on a legal misunderstanding was not animated by "strategic calculation").

If, as respondent suggests, it was GaNun's intention to expose Wilson's prior criminal history, it was not sound trial strategy. See Lyons v. McCotter, 770 F.2d 529, 533 (5th Cir. 1985) (finding that defense counsel's "introduction of the existence of [defendant's] criminal record [involving the same offense] was a strategic, albeit inane, trial tactic" that rendered his assistance ineffective). See also Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001) (defining "strategic" decision as a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client . . . ."); Bean v. Calderon, 163 F.3d 1073, 1079 (9th Cir. 1998) (noting that a decision cannot be characterized as "strategic" where it was a result of "confusion" and a "deficiency in trial preparation"). Faced with the choice of excluding a defendant's criminal record or introducing it and then attempting to prove the defendant had rehabilitated himself, no reasonable lawyer would have proceeded as GaNun did.

B.  Defense Counsel Introduced in Evidence a 1994 Police Complaint Report Against Wilson

Petitioner argues that GaNun erred by introducing a police complaint report of an unrelated 1994 arrest in which Wilson and others were charged with attempted grand larceny, menacing, and grand larceny by extortion for unlawfully entering a construction site armed with metal pipes. (Pet.'s Mem. at 2, 13.) He contends that the report was prejudicial, that GaNun made little use of it at trial, and that the decision to introduce it was not a strategic choice made after thorough investigation but "an impulsive and ill-conceived decision made without the slightest appreciation of the risks involved." (Petitioner's Reply Memorandum, dated Oct. 28, 2005, at 12 n. 2.) Respondent counters that GaNun made a strategic decision to use the report to

show the police "were lying and willing to arrest petitioner without the benefit of a thorough investigation." (Resp.'s Mem. at 18.) Specifically, GaNun was trying to show that Wilson was arrested pursuant to a haphazardly filed wanted card that listed Wilson as a suspect in the robbery without adequate investigation. GaNun also used the report, which listed the date and time of Wilson's arrest, to argue on summation that the arresting officer, Michael Singer, had lied on cross examination when he testified that he did not know what time Wilson was arrested on October 27, 1994 and that he had no documentation of the time of the arrest. (Id.) Finally, respondent argues that GaNun was using the report to be "honest with the jury" about Wilson's history, and to show that his labor-related activities at the construction site were designed to "get jobs for people in the community." (Id. at 19; EH at 87-88, 90, 107.) Respondent insists this strategy had "no consequences" because the 1994 charges were dismissed. (Resp.'s Mem. at 19; EH at 86.) Respondent's arguments are unpersuasive.

As an initial matter, respondent's arguments proceed from a fundamental misunderstanding of the facts. Respondent erroneously states that Wilson's arrest on the 1994 "labor matter" preceded and caused the filing of the wanted card which ultimately resulted in Wilson's arrest for the robbery. (Resp.'s Mem. at 18) ("part of [GaNun's] defense strategy was to establish that petitioner was arrested pursuant to a haphazardly-filed wanted card. . . . [B]efore the wanted card had been filed, petitioner had been arrested for a labor matter that was not even criminal."); (see id. at 24) (stating Wilson was arrested at the construction site, a complaint report was then filed and a mugshot taken and placed into the police precinct's mugshot book, from which Erra identified Wilson as one of the robbers, "and a wanted card for petitioner was then filed. Yet petitioner was not arrested for committing the robbery for two years."). In fact,

the wanted (or arrest) card was filed in 1992 – after Erra identified Wilson in a police photo-book and he became a suspect in the 1992 robbery. The arrest at the construction site did not occur until 1994 and had nothing to do with the filing of the wanted card, the taking of the mugshot (in 1988) that was placed in the precinct photo-book, or Erra's identification of Wilson from a photo array. Thus, respondent's explanation for GaNun's use of the complaint report to challenge the wanted card is based on a misunderstanding of the facts. If GaNun wished to question the adequacy of the robbery investigation or the filing of the wanted card, he could have done so without introducing the complaint report, or, at a minimum, redacted the most prejudicial statements and simply alluded to the fact of the arrest.[11]

Petitioner is correct that GaNun made little use of the complaint report. The report came in during the cross examination of Officer Michael Singer, who testified that he had conducted the 1994 lineup in which Erra identified Wilson as one of the robbers. GaNun wanted

---

[11]  During his opening statement, GaNun stated that:

> In October of 1994, two years practically after this incident [the robbery] went down, George Wilson and nine or ten other members of the coalition were at a job site in Astoria.

> The police came down and the police arrested all ten and they charged them with various crimes. The bottom line was all the crimes were dismissed.

> The next day, with regard to George Wilson, they said, "Oh, George Wilson, we have an arrest card for George Wilson.'

> . . . .

> They stuck him in a lineup and theoretically he was picked out of the lineup and that, ladies and gentlemen, is the case.

(Tr. at 308-09.)

to impeach Singer on an inconsequential matter concerning his knowledge of the time of Wilson's arrest and the time of the lineup. (Tr. at 657-661, 667-670, 671-678.)  When GaNun asked to have the report admitted in evidence, Justice LaTorella asked, "do you really want this in evidence?" to which GaNun answered, "[a]bsolutely." (Id. at 660-62.)  The judge then responded, "I'm not going to ask you what your theory of defense is.  All I'm going to say to you is, I would not let the jury see this in ten million years unless you specifically wanted it. . . ." (Id. at 662.)  The judge asked GaNun twice whether he was sure he wanted to introduce the report and inquired whether he wanted any part of the report redacted.  (Id.)  When he admitted the report Justice LaTorella pointedly noted, "I would not let something like this go in inadvertently because it has . . . potentially a very prejudicial effect ."  (Id. at 664-65.)

When respondent's counsel asked GaNun at the evidentiary hearing what he thought Justice LaTorella meant by these statements, GaNun showed no understanding of the prejudicial value of this propensity evidence.[12]  Petitioner's counsel then read to him part of the 1994 complaint, which said "Mr. Wilson acting in concert with seven other perps did attempt grand larceny, extortion, menacing with pipes at above location."  (EH at 47) (quoting the 1994 Complaint Report; see EH at 43-44 (discussing trial Ex. F, the Complaint Report).)  When asked if there was anything prejudicial about admitting this report in evidence, GaNun stated, "[n]ot on the whole case.  The whole case had nothing to do with this particular case.  This is the reason he was arrested, was the wanted card."  (Id. at 47.)

---

[12] He responded as follows: "Well obviously myself and the court were having a problem with getting along.  I don't know what he meant because this was the situation where Mr. Wilson had been arrested on this situation [at the construction site] and he wasn't convicted on [sic].  So, I had no problem with this going in."  (EH at 45.)  When asked whether he saw anything prejudicial in these documents, GaNun answered, "no."  (Id. at 45-46.)

However, the prosecutor was able to exploit the report to his advantage during his cross examination of Bernard Garrett, a defense witness who was arrested with Wilson in October 1994. Because the report was already in evidence, the judge allowed the prosecutor to read directly from the complaint report which stated that the men attempted "Grand Larceny Extortion, menacing with pipes . . . ." (Tr. at 865-67.)

When respondent's counsel asked GaNun at the evidentiary hearing why he introduced the complaint report, he stated, "I was trying to show to the jury that . . . it was for want of a better word baloney because all of these guys were trying to do [sic] was get jobs for people in the community." (EH at 87-88.) However, there were other, less harmful ways of showing Wilson's community activism.

In respondent's original opposition brief, filed in 2001, the State acknowledged that "it is unclear whether the introduction of this report furthered counsel's strategy in a significant way" and only surmised that it could help "show the petitioner's community activist side . . . ." (See Memorandum of Law in Opposition to Writ of Habeas Corpus, dated Aug. 3, 2001, at 13.) It is equally difficult today to discern a sound justification for admitting prejudicial allegations of unrelated arrests and bad acts into evidence.

C. Opening the Door to Erra's Photo Array Identification of Wilson

As explained above, the major weakness in the prosecution's case was the lack of physical evidence tying Wilson to the robbery. The primary evidence connecting petitioner to the crime was the eyewitness testimony of a single individual, Roger Erra, who identified Wilson from a photo array conducted on the day of the robbery and again at a lineup approximately two years later. It is undisputed that the photo array was inadmissible at trial unless defendant

opened the door.  (Tr. at 34-36.)  This left the prosecution with an identification made two years

after the robbery by a witness who had not seen the suspect before or since the incident.  As a

result, misidentification was a critical element of Wilson's defense.[13]

Petitioner contends that GaNun seriously undermined this defense when he

opened the door to the admission of the photo array, despite repeated warnings from the judge.

He asserts that GaNun did so because he again either failed to understand the judge's rulings or

intentionally ignored them.  (Pet.'s Mem. at 15.)  In either event, petitioner argues, trial counsel

allowed the prosecution to introduce "probably the single most damaging piece of evidence in

the case" for no justifiable strategic reason.  (Id. at 17.)  This signaled to the jury that Wilson had

a police record and undercut Wilson's mistaken-identification defense.  Respondent insists that

counsel's actions were "plainly strategic," asserting that GaNun advantageously used the photo

array identification to bolster his theory that the police had conducted a sloppy and inadequate

investigation.  (Resp.'s Mem. at 21-23.)   A review of the trial transcript and GaNun's testimony

at the evidentiary hearing leaves little doubt that defense counsel failed to appreciate the

significance of the photo array identification and undermined his own case by disregarding the

judge's warnings.

The issue was flagged for the defense at the very beginning of the trial, when the

prosecutor conceded that New York law prevented him from introducing the photo array ID

unless the defense opened the door.  (Tr. at 34-36.)  The judge agreed, observing that the photo

"can have a great deal of importance because the arrest wasn't made until a substantial time after

---

[13] GaNun told the judge during a sidebar discussion that "it's been our position since day
one in this case that this is the case of the wrong man.  Mr. Erra picked out the wrong man." (Tr.
at 386.)

the alleged crime.  So you have an I.D. from the photo array close to the res gestae time, it's very important."  (Id. at 34-35.)

In his opening statement, GaNun emphasized that the police had conducted "no investigation" of the robbery, noting that "[t]hey didn't take any prints.  They didn't take any photographs."  (Id. at 306-07, 309.)  The prosecutor then argued that GaNun's assertion that the police had not investigated the robbery had opened the door to the admission of the photo array ID.  (Id. at 389.)  The judge agreed that challenging the adequacy of the investigation would open the door but denied the prosecutor's request at that time, because GaNun had only made these assertions during his opening statement.  However, he explicitly warned GaNun that the door would be opened if he followed the same tack on cross examination.[14]

---

[14]  Justice LaTorella warned GaNun:

> [Y]ou made an opening, Mr. GaNun, in which you said the jury, proved to the satisfaction of the jury the police did not conduct a meaningful investigation.
>
> . . . .
>
> . . . I made no ruling, I'm just asking for you to both think about this from a legal standpoint, because I'm obviously going to be invited to make a ruling at some point.
>
>  . . . .
>
> The very day of the crime allegedly, the detectives showed mug books to the complaining witness and he picked out the defendant's picture out of the mug book.
>
> They then wrote out an arrest card and two years later, when the defendant was arrested, the arrest card hit, and the detective called the complaining witness down for a lineup and they put the

(continued...)

Ignoring this warning, GaNun proceeded to cross-examine Erra in some detail about the adequacy of the police investigation after the 1992 robbery, including whether diagrams and photographs were made of the crime scene.  (Id. at 460-61.)  At the conclusion of his cross examination, Justice LaTorella called counsel to sidebar and asked them whether the prosecution's request to admit the photo array ID should be granted as a result of GaNun's questions.[15]

---

[14](...continued)
    defendant in a lineup for this purpose.

    I'd say that's an investigation.

    . . . .

    If you ask those questions on cross examination, I think you will
    have opened up the door . . . .

(Tr. at 390-92.)

[15] At a sidebar conference, Justice LaTorella said:

    I have heard during the course of cross examination by the defense
    several questions directly related to the existence of a police
    investigation, that is, did they [police] require the witness to make
    a diagram?

    Did they make photographs of the premises?

    Did they take fingerprints?

    Did the crime scene people come or was it the local precinct?

    What did the witness tell the Police Department about a car?  And
    so forth.

    Address those issues to me when I come back and I understand
    that the time has now come to entertain the Prosecution's
    application to introduce the photo I.D.

                                                        (continued...)

After the prosecutor cited case law and insisted that the door had been opened, the court turned to GaNun.  (Id. at 502-05.)  Instead of addressing this pivotal issue, GaNun chose to reargue an earlier dispute about the timing of a recess and the necessity of saying the word "exception" in order to preserve an objection for appellate review.  (Id. at 505) ("[M]ay I go back to the issue before the Court left the bench before?  I made an exception to the Judge's ruling and the Judge went into a colloquy about running the courtroom.").  When GaNun finally got around to discussing the photo array ID, he stated that "the door wasn't open, number one . . . because the statement 'poor investigation' doesn't relate to anything about photographic identification.  Secondly, your Honor, in regard to the cross examination of Mr. Erra, at no time did I go near the issue of photographic identification.  I talked about fingerprinting, I talked about the Nissan."  (Id. at 508-09; see also id. at 521.)  GaNun cited no case law and was not prepared to distinguish the cases cited by the prosecutor.

Justice LaTorella adopted the prosecutor's arguments and admitted the photo array ID.  (Id. at 511-16.)  In his ruling, he specifically found that GaNun had opened "[t]his door . . . so wide, I've never seen a wider open door."  (Id. at 516.)  Yet in doing so, GaNun had asked questions about the police investigation that were "not material . . . [or] even particularly relevant to the identification."  (Id. at 515-16.)  As a result, the prosecutor was able to show the jury that Erra had in fact identified Wilson at a photo array on the day of the robbery – not two years later – thereby eviscerating petitioner's mistaken identification defense.

At the evidentiary hearing, GaNun was asked numerous times to explain his

---

[15](...continued)
(Tr. at 500.)

strategy, but could not do so coherently. His answers were often rambling, evasive, and unfocused. His explanation of his strategy was unpersuasive and betrayed little understanding of the judge's rulings or the potential disaster he was courting by ignoring them. When asked whether he realized that the exclusion of the photo array was critical to Wilson's case, GaNun answered, "again, it was another situation. We knew what the charge was against Mr. Wilson and it was our position that an innocent man [sic] and that by all of the prior situations he was in, he had turned his life around. And our position was okay. [They] took a picture of him when he was arrested [in 1988]. So what." (EH at 58.)

The following exchange then occurred between GaNun and petitioner's counsel:

Q: But you thought you had to ask specifically about the photo ID to open the door.

A: Yes.

Q: You didn't think that asking about other parts of the police investigation could open the door.

A: No.

. . . .

Q: Would you agree, Mr. GaNun, that the admission of the photo array identification was extremely damaging to Mr. Wilson's defense?

A: No.

(Id. at 60-61.) GaNun then stated that he had no problem with the admission of the photo array ID. (Id. at 62.)

Nonetheless, respondent argues that GaNun's actions were strategic. Because the wanted card was placed in Wilson's police file shortly after the robbery, respondent notes that the jury would have known Wilson was a suspect shortly after the robbery. "Rather than permit the jury to speculate on how petitioner became a suspect," respondent argues, "it was reasonable for counsel to allow for the admission of the photographic identification and subsequently argue its unreliability." (Resp.'s Mem. at 21.) Thus, when GaNun asked Erra to review other photographs of petitioner during the trial, he was unable to identify Wilson in several of them. (Id. at 22.) In this way, the State contends, GaNun was able to cast doubt on the reliability of Erra's photographic identification of petitioner. (Id.)[16] However, if this was his strategy, it was

---

[16] At the hearing, GaNun provided the following answers in response to respondent's questioning:

> Q: Would you say the purpose of [showing Erra other photos] was to cast doubt on the reliability of Mr. Erra's identification of your client?
>
> A: Absolutely.
>
> Q: And that was your trial strategy?
>
> A: Yes.
>
> Q: You do not think that admission of the photo array was damaging at all to Mr. Wilson's case; correct?
>
> A: In retrospect it might have been damaging but we had a situation in this particular trial in this particular court that it was – despite that problem, and it was a problem, I believed that we were going to be victorious and I always thought that the judge made a terrible error by not allowing – in a sense, give the jury a day off during the holiday [Yom Kippur] and bring them back and read to them what they wanted to hear, mainly, they wanted to hear certain testimony read back [during deliberations] and he didn't do it . . . .

(continued...)

extremely ill-advised. The jury may have speculated as to why Wilson was a suspect after the robbery, but GaNun removed any doubt as to those suspicions by confirming the worst, *i.e.*, that Erra had picked him out of a photo array the day of the robbery.

Yet, there is little evidence that GaNun appreciated the importance of the photo array ID. For example, when respondent's counsel asked him at the evidentiary hearing "[i]s it fair to say that you knew that the jury would be informed within a day of the robbery petitioner became a suspect for the crime?" GaNun answered, "I don't recall that really being an issue. The issue really was the [1994] arrest took place two years after the robbery." (EH at 94.) A few minutes later, the following exchange occurred:

> Q: Did you have a strategy as to the mitigation of any prejudice to
> the petitioner with regard to the admission of the photo array?
>
> A: I don't really understand your question. The photo array came
> in – did I have a strategy? About what? Mitigating?
>
> Q: Mitigating any prejudice that could result?
>
> A: It was our position to let the jury know what caused Mr. Wilson
> to be arrested and it was nothing major, it was an old matter, it was
> a violation [in 1988, which produced the 'mugshot'], that his
> record somehow was put into the system and like a lot of
> situations, once you're [sic] name is in the system it's tough to get
> out of the system.

(Id. at 96.)

GaNun never acknowledged the substantial prejudice resulting from the

---

<sup>16</sup>(...continued)
(EH at 93.)

admission of the contemporaneous photo array ID.  As the judge and the prosecutor clearly

recognized, the photo array ID plugged a large hole in the prosecution's case, suggesting to the

jury that Erra's identification of Wilson in the 1994 lineup was no accident, as Erra had also

picked him out of a photo array immediately after the robbery.  In fact, during the prosecutor's

summation, the first thing he noted was that Erra first identified Wilson the day of the robbery in

1992, and that this fact hampered GaNun's mistaken identification defense.  (Tr. at 1026-27.)

Whether GaNun failed to understand the judge's rulings or simply did not appreciate the

significance of the photo array ID, petitioner's attorney had no competent strategy on this issue

and provided manifestly ineffective assistance of counsel.

     D.  <u>GaNun's Refusal to Object to the Use of the Term 'Mugshots'</u>
        <u>and 'Mug books' or to Seek Redaction of the 'Mugshot' Photo</u>

     After GaNun opened the door to the admission of the photo array ID, the

prosecutor examined Erra on redirect and used the term "mug shot" three times in referring to

Wilson's picture in the police photo book.  (Tr. at 530.)  The prosecutor also used the term "mug

books."  (<u>Id.</u> at 532.)  GaNun failed to object to these terms, which clearly communicated to the

jury that Wilson had a prior criminal record, because, as he later admitted to Justice LaTorella,

he was not paying attention.   (<u>Id.</u> at 540) ("Unfortunately, I probably didn't hear the word,

'mugshot.'")  He further compounded the problem by using the term "mug book" himself during

his recross of Erra.  (<u>Id.</u> at 617.)  <u>See</u> <u>People v. Cuiman</u>, 229 A.D.2d 280, 284-85 (1st Dep't

1997) ("[T]he fairness of the defendant's trial was . . . fatally compromised by the . . .

identification of the photo as an 'arrest photo of the defendant.'").

     The prosecutor also moved to have Wilson's "mug shot" photograph admitted

into evidence.  The photo showed Wilson with a police department plaque around his neck bearing a 1988 arrest date.  When the judge asked GaNun whether he would move to have the plaque redacted if the photograph were allowed into evidence, GaNun said yes.  (Id. at 540) ("Obviously, I would ask that it be redacted.")  However, when the time came to request the redaction, GaNun changed his mind.  (Id. at 542.)  At the evidentiary hearing, GaNun provided no satisfactory explanation for this change of heart.  He said, "[i]t was another issue that we had with the Court.  We had made the objection to the photograph initially.  We had the quote exception for appellate purposes and it was like okay, let's get on with the case in chief."  (EH at 66-67.)  It is unclear why GaNun would choose to let the jury see an unredacted "mugshot" in order to preserve an "exception" for appellate purposes.

Respondent argues that "counsel's decision to leave in the numerical plaque comports with his defense strategy that petitioner's current case was based on no direct evidence but emanated from an arrest for a mere violation – an arrest that resulted in that very mugshot." (Resp.'s Mem. at 26.)  However, I find that there was simply no need for the jury to see more evidence that Erra selected a photo that "emanated" from an earlier arrest.  It is unclear how that information could have helped the defense.

### E.  GaNun Elicited Retaliation Testimony from the Complainant

Erra, the State's lone witness to the crime, failed to appear for the first two days of trial and did not advise the prosecutor that he would be absent.  (Tr. at 340.)  As a result the judge issued a material witness warrant compelling Erra's attendance at trial.  (Id. at 341, 345.) Erra appeared in court the following day accompanied by two officers who had executed the warrant at his home.  (Id. at 488-91, 570-77.)   Before Erra took the stand, the judge asked him

outside of the jury's hearing whether he had any fear of being a witness.   Erra responded that his

only fear was "somebody knowing my home address," implying that he was afraid of reprisals.

(Id. at 370.)  Although GaNun was not present for this discussion, the judge gave him a copy of

the transcript containing Erra's response.  (Id. at 381-83.)

On cross examination, GaNun asked Erra whether he had any "reluctance" to

come to court and testify; Erra answered, "[n]o."  (Id. at 491-92.)  Erra then testified as follows:

> Q: Did you have any fear to testify in this case?
>
> A: Yes.
>
> Q: And what was that fear?
>
> A: I fear for my family, I fear for myself.
>
> . . . .
>
> Q: Now, from 1992 till today, have you been threatened in any
> manner?
>
> A: No.
>
> . . . .
>
> Mr. GaNun: I have no further questions.  Thank you very much.
> One more question.
>
> The Court: Yes, sir, go ahead.
>
> Q:  Were you in fear of this defendant, George Wilson?

A:  Yes.

Q: And why were you in fear of this defendant, George Wilson?

A: Reprisals.

(Id. at 492.)  When asked at the evidentiary hearing why he initiated this line of questioning,

GaNun stated:

> All I could say it was a defense tactic.  I wanted to let the jury
> know that this guy wasn't a 'willing' witness to the crime that he
> apparently (inaudible).  He had this issue of being subject to
> reprisals.  I asked him, had you from the day of the incident, to this
> date, been attacked or had any kind of attack on him and he said
> no. . . . our position [was Erra] was a puppet of the police.

(EH at 71.)[17]

---

[17] The questioning then proceeded:

> Q:  So you asked the question not expecting that he was going to
> say that he was in fear of Mr. Wilson.
>
> A:  No, but it wasn't that critical at the time. . . . I thought he
> should – the jury should know about that[,] that this guy is not
> coming here because he is a[n] outraged citizen, that he knows that
> this is the guy who did it.
>
> . . . .
>
> Q:  You were unconcerned that he had testified that he feared
> reprisals . . . from Mr. Wilson?
>
> A:  The issue of the reprisals was he hadn't been reprisaled against
> since the time of this incident.  If Mr. Wilson or anybody else was
> going to go back after him, they had two years to go back after him
> and nothing had happened.  His fear was unfounded.
>
> (continued...)

Respondent's counsel followed up with these questions at the evidentiary hearing:

Q: Did you expect [Erra] . . . to give the same answer that he had previously given the judge [concerning fear of testifying]?

A: Well, it was a question that either he was going to say, "No, I didn't fear Mr. Wilson," or "Yes, I did fear Mr. Wilson." If he said no that would be super. If he said yes it would be something to deal with and I thought we were dealing with it.

Q: You dealt with it in what way?

A: We dealt with it by trying to impress to the jury that, 'Hey, listen, this is a guy [Wilson] who had a bad situation years ago and he popped up in this investigation but there was no investigation.'

(Id. at 99-100.) GaNun was then asked whether he had a trial strategy in this regard, and he

_____

[17](...continued)
. . . .

Q: And that was actually beneficial then for Mr. Wilson to have Mr. Erra testify that he was afraid of Mr. Wilson?

A: Well, first of all, Mr. Erra had said that Mr. Wilson is the guy who robbed him on a particular date two years ago. It's just another issue. In other words, like, oh yeah, he's also said this, that and the other thing. And it would say to the jury perhaps that this guy may be out to get Mr. Wilson.

Q: Because he was afraid of him?

A: Whatever.

Q: That's the conclusion you thought the jury would [have] drawn.

A: I don't know what I thought about it at the time.

(EH at 71-73.)

stated that it was another case "of the man" going "after the poor guys on the dock.. . . . Some people would say that that answer is a prosecutor's ploy, you know, 'If he's asked this question, say this.' You know, something for the prosecution." (Id. at 100.) GaNun conceded that he did not know Erra was going to say he feared Wilson and acknowledged that such a statement "would be" damaging to Wilson. (Id. at 112.)

Respondent argues that GaNun's strategy in questioning Erra was to cast doubt on Erra's identification of petitioner "by impeaching Erra's credibility generally, and by specifically undermining the reliability of his identification testimony." (Resp.'s Mem. at 29.) This argument is unpersuasive. The court can discern no sound strategy in GaNun's questioning on this topic. Respondent's strongest argument is that, although Erra made a mistake in asking the question, his error "did not give rise to a valid claim of ineffective assistance" because it was not overly prejudicial. (Id.) The court will address prejudice below.

F. Conclusion

As to the first prong of Strickland, I find that the cumulative weight of GaNun's errors deprived Wilson of his Sixth Amendment right to counsel. See Pavel, 261 F.3d at 216 (finding that the cumulative weight of counsel's three errors constituted ineffective assistance, and as such, the court need "not consider whether *some* of these flaws – standing alone, or in combination with one another – could adequately support our conclusion that [counsel's] representation of [defendant] was constitutionally deficient."); Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2002) (holding that for Sixth Amendment purposes attorney errors must be considered "in the aggregate"). This court agrees with the Second Circuit, and finds that "the record [both at trial and at the evidentiary hearing] fails to suggest any plausible trial strategy for

34

at least some of the acts or omissions about which Wilson complains." <u>Wilson</u>, 119 Fed. Appx. at 337-38 (internal quotations omitted). As outlined above, GaNun made serious errors that allowed the jury to learn of the otherwise inadmissible photo array ID and Wilson's criminal history. GaNun's acts were not the result of a deliberate and reasonably informed trial strategy. <u>See</u> <u>Pavel</u>, 261 F.3d at 218; <u>Eze</u>, 321 F.3d at 112. <u>See</u> <u>also</u> <u>Loliscio v. Goord</u>, 263 F.3d 178, 195 (2d Cir. 2001) (petitioner satisfied prong one because counsel's "purported strategy" was "simply incoherent").

Respondent suggests that GaNun was an effective attorney because Justice LaTorella, although concerned about some of GaNun's trial tactics, ultimately concluded that GaNun had a "possible strategy." (Resp.'s Mem. at 36-37.) However, a possible strategy is not the same as a "sound trial strategy," especially when the apparent strategy is the result of "oversight, carelessness, ineptitude, or laziness . . . ." <u>Eze</u>, 321 F.3d at 112. After holding an evidentiary hearing and reviewing the trial transcript in its entirety, I find that GaNun's "strategy," if any, was far from sound, but rather was the unfortunate result of oversight, carelessness, and ineptitude.

III. <u>Strickland Analysis: Prong Two</u>

The prejudice prong of the <u>Strickland</u> test requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," and that "there is a reasonable probability that, but for counsel's unprofessional errors," the trial result would have been different. 466 U.S. at 687, 694. In <u>Strickland</u>, the Court rejected the more stringent outcome-determinative test, which would have required a petitioner to show that counsel's deficient performance "more likely than not" altered the outcome of the case. <u>Id.</u> at

693-94.  Instead, Strickland requires that a petitioner demonstrate a "reasonable probability . . . a probability sufficient to undermine confidence in the outcome."  Id. at 694.  Under this standard a proceeding can be found unreliable "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  Id.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  "[I]f it is determined following an evidentiary hearing that counsel's trial performance was constitutionally deficient, it is highly likely that Strickland's prejudice component would be satisfied."  Eze, 321 F.3d at 137.

In this case, the cumulative weight of defense counsel's errors has "undermine[d] confidence in the outcome."  Strickland, 466 U.S. at 694.  The prosecution began the trial with serious weaknesses.  There was no physical evidence linking Wilson to the robbery; petitioner made no inculpatory statements; and the People could produce only the testimony of one eyewitness, Roger Erra, who had never seen the robbers before the incident.  Further, Erra, the prosecutor's chief witness, initially failed to come to court and may have lied to the prosecutor to avoid testifying.  (Tr. at 286, 315, 341.)  To prove its case, the prosecution needed to convince the jury that Erra had accurately identified Wilson.  Without GaNun's errors, the jury would have learned that Wilson became a suspect in the 1992 robbery, but that the only identification was made at a lineup two years later.[18]   Finally, the jury would not have known of Wilson's prior convictions.

---

[18] Further, the five fillers may have been older, as they "were [all] veterans living in a veteran shelter."  (Tr. at 697-98; see also Respondent's Brief to the Appellate Division, dated Jan. 24, 2000, at 22.)

Because of trial counsel's ineptitude, the jury learned that Erra had picked Wilson out of a photo array the day of the robbery, that he had a criminal record, and that the chief prosecution witness was afraid of him. Through evidence introduced by defense counsel himself, the jury heard that petitioner had unlawfully entered a construction site with other men who were allegedly armed with metal pipes. As a result of counsel's inattentiveness, the jury heard that Wilson's picture was in a book of photographs of men with arrest records and saw an unredacted "mug shot" of Wilson with a New York City Police Department plaque hanging from his neck, branding him as a criminal. Finally, because counsel failed to heed the judge's warnings about character testimony, the jury learned that Wilson had been convicted of possessing cocaine and had pled guilty to punching a woman. One by one, defense counsel's ineptitude cut out the legs from under his misidentification defense, corroborating the lineup identification through the photo array and suggesting a propensity for criminality by allowing the jury to learn of Wilson's past criminal record.

Nonetheless, respondent argues that Wilson suffered no prejudice because Erra's identification was sufficiently reliable to obtain a conviction, as Erra observed the robbers at close range for about ten minutes in a brightly lit room (Tr. at 410-20, 423-29) and he had no apparent difficulty identifying Wilson at the time of trial. See Neil v. Biggers, 409 U.S. 188 (1972) (laying out the standard for a reliable identification).

However, Erra's identification was questionable in some critical respects. Erra had never seen Wilson before the robbery, and two years passed before he picked petitioner out of a lineup. His descriptions of the perpetrators immediately after the robbery were vague and unremarkable. He could recall no unusual or distinguishing characteristics that would enable

him to identify Robber One, other than the "roundness" of his face.[19]  (Tr. at 484.)  When asked

at trial how he had described petitioner to the police, Erra said simply a "lighter" skinned black

male, "[s]ix foot, two hundred something pounds."  (Id. at 432-33, 483.)[20]  There was no

description of his eyes, hair, teeth, gestures, voice, manner of speech, or any facial feature

besides his round face.  (Id. at 463.)[21]  In short, there was little evidence to support the

identification.

        In addition, it is well established that eyewitness identification is one of the least

reliable forms of evidence.  As the Second Circuit has held, "testimony that identifies a

defendant previously unknown to the witness is highly suspect.  Of all the various kinds of

---

[19] During GaNun's cross of Erra, the following exchange occurred:

> Q:  Now, the person you saw on December 22, 1992, was there
> anything peculiar about his facial – his face?
>
> Mr. Russo:  Objection.
>
> The Court:  Overruled.
>
> A:  No.
>
> Q:  Well, what made that person so peculiar to you that you could
> claim an identification?
>
> A:  His facial features, I mean structure of the face, roundness.

(Tr. at 483-84.)

[20] Officer Tricarico confirmed the sketchiness of Erra's post-robbery description.  At trial
Officer Tricarico testified that, immediately after the robbery, Erra had described the robbers as
"[t]wo male blacks . . . one was about six feet tall, stocky, and the other one was a little bit
shorter and a little bit thinner."  (Tr. at 716.)

[21] In addition, according to Erra, the perpetrator was also wearing a baseball style cap,
with the bill forward,  which could have made it difficult to see his eyes and his hair.  Erra did
not notice if there was an insignia on the baseball cap.  (Tr. at 465, 473, 579.)

evidence it is the least reliable, especially where unsupported by corroborating evidence."

Harper v. Kelly, 916 F.2d 54, 56 (2d Cir. 1990) (quoting Jackson v. Fogg, 589 F.2d 108, 112 (2d

Cir. 1978)).   Where, to the jury's knowledge, that identification was uncorroborated and was not

made until two years after the crime, its reliability is especially questionable.[22]

       Respondent cites Denham v. Deed, 954 F.2d 1501 (9th Cir. 1992), for the

proposition that an identification is reliable when a witness views the defendant at very close

range.  This reliance is misplaced.  In Denham, there were two witnesses who independently

identified the defendant in a photo lineup a few days after the incident.  Id. at 1502.

Additionally, the court never analyzed the second prong of Strickland because it found that

counsel "made reasonable, informed tactical decisions."  Id. at 1506.  Respondent also points to

Sales v. Harris, 675 F.2d 532, 538-39 (2d Cir. 1982), where the court held that the identification

was reliable because the witness had "ample opportunity to view" the defendant at close range

under excellent lighting.  However, Sales did not involve an ineffective assistance claim, and

consequently there was no Strickland analysis.  Id. at 538-39.  Furthermore, Sales was decided

well before the use of DNA evidence and before courts fully grasped the unreliability of

eyewitness identification.  In short, none of these cases are persuasive, and in any event

Strickland mandates that a court hearing an ineffective assistance claim evaluate the case on its

own facts and "consider the totality of the evidence before the judge or jury."  446 U.S. at 695.

       In this case, I find that GaNun's errors were severe and prejudicial.  By itself,

opening the door to the photo array ID may well be enough to constitute prejudice.  However,

---

[22] Additionally, Erra's identification of Wilson was cross-racial.  (Pet's. Mem. at 21.)
See Harris v. Senkowski, 298 F. Supp. 2d 320, 337 (E.D.N.Y. 2004) (finding that a cross-racial
identification is much less likely to be accurate.)

when combined with counsel's other serious mistakes, there is little doubt that petitioner has satisfied the second prong of Strickland. That is, "consider[ing] the totality of the evidence before the . . . jury," Strickland, 466 U.S. at 695, and bearing in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," id. at 696, I find there is a reasonable probability that, but for GaNun's errors, the jury would not have reached a unanimous verdict of guilt. See Pavel, 261 F.3d at 228 ("Had [counsel] performed in a constitutionally effective manner, there is – at the very least – a 'reasonable probability' that [the defendant] would not have been convicted of the crimes with which he was charged . . . .").[23]

IV. AEDPA

When the state court has rejected the petitioner's claim on the merits, a federal court considering a habeas corpus petition under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), must defer to the state court's rejection of the claim, and must deny the writ unless the state-court adjudication (1) "was contrary to," or (2) "involved an unreasonable application of," clearly established federal law "as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Williams, 529 U.S. at 412-13

_____

[23] See also Mitchell v. Henry, No. 97-17435, 1998 U.S. App. LEXIS 16384, at *9 (9th Cir. July 15, 1998) (granting habeas petition, even though there was one unimpeachable eyewitness identification, in part because other witnesses were unable to identify the defendant prior to trial); Lyons, 770 F.2d at 532 n. 5 (stating that the prosecution's case was "far from overwhelming" where it relied on the uncorroborated identification testimony of one eyewitness, even though that witness gave "unequivocal testimony at the pre-trial hearing and at trial identifying [the defendant]."); Harris v. Senkowski, 298 F. Supp. 2d 320, 336, 341 (E.D.N.Y. 2004) ("Courts have consistently viewed convictions built upon uncorroborated eyewitness identification with skepticism" and ultimately, "trial counsel's errors seriously undermined the reliability of the jury's verdict.").

(2000); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005).[24]  In Williams, the Court held that

"under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

state court identifies the correct governing legal principle from this Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case."  529 U.S. at 413.  The

Second Circuit has concluded that an "objectively unreasonable" application of Supreme Court

precedent falls somewhere between "merely erroneous and unreasonable to all reasonable

jurists."  Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000).  "If, after carefully weighing all

the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's

custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529

U.S. at 389.            In the instant case, the New York Court of Appeals denied petitioner's

request for leave to appeal on November 27, 2000.  See People v. Wilson, 744 N.E.2d 152 (N.Y.

2000).  Hence, the relevant state court decision is that of the Appellate Division, which declared

that petitioner's federal constitutional claim was "without merit."  709 N.Y.S.2d 415 (2d Dep't

2000).  "Such a summary determination, even absent citation of federal case law, is a

determination 'on the merits' and as such requires the deference specified by § 2254."  Wade v.

Herbert, 391 F.3d 135, 140 (2d Cir. 2004).  However, the Second Circuit has consistently held

that when the "Appellate Division [and] the New York Court of Appeals" do not address the

"ineffectiveness argument beyond a brief statement that the argument was without merit," the

federal court should turn "directly to the facts of the case to determine whether Strickland was

applied unreasonably."  Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004).  See also Eze, 321

---

[24] In this case, the Appellate Division did not cite federal law in denying Wilson's
ineffectiveness claim.  However, the Second Circuit has held that the state test "is not contrary to
the Strickland test for purposes of § 2254."  Eze, 321 F.3d at 124.

F.3d at 125 (when state court failed to articulate its rationale for denying ineffective assistance of counsel claim, federal habeas court engaged in review of counsel's performance at trial); Aeid v. Bennett, 296 F.3d 58, 62 (2d Cir. 2002) (because "state courts summarily rejected [habeas petitioner's] ineffective assistance of counsel claim on the merits without explanation, we must focus on the ultimate decisions of those courts, rather than on the courts' reasoning.").  I find that petitioner has satisfied the Strickland test; accordingly, the state courts' denial of Wilson's appeal "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  See Cox, 387 F.3d at 201; Lindstadt, 239 F.3d at 205.

## CONCLUSION

For the reasons stated above, I respectfully recommend that the petition for a writ of habeas corpus be granted.  Objections to this report and recommendation must be filed within ten (10) days, with courtesy copies to Judge Trager and to my chambers, in order to preserve appellate review.  See 28 U.S.C. § 636(b)(1).

Respectfully submitted,

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

Dated:  Brooklyn, New York
        June 30, 2006