UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------- x

GEORGE WILSON,

                              Petitioner,              <u>MEMORANDUM AND</u>
                                                       <u>ORDER</u>

        - against -
                                                       Civil Action No.
WILLIAM MAZZUCA, Superintendent,                       CV-01-2246 (DGT)
Fishkill Correctional Facility,

                              Respondent.
                                                 x
--------------------------------------------------

TRAGER, J.

        On June 30, 2006, Magistrate Judge Robert M. Levy issued a

Report and Recommendation recommending that the habeas petition

of George Wilson ("petitioner" or "defendant") be granted.

Petitioner was seeking relief from a 1995 robbery conviction in

New York State Court.  William Mazzuca ("respondent" or "the

State") filed a timely objection to the Report and

Recommendation.  For the reasons set out below, this court

declines to adopt the Report and Recommendation and, instead,

denies defendant's petition.


### Background

### (1)

### The Robbery

        On December 22, 1992, Roger Erra, the owner and manager of

Erra Metals, a scrap metal business located at 37-35 21st Street

in Queens, New York, was robbed by two men.  At approximately two o'clock in the afternoon, Erra was in his office on the second floor of his business when two men (Robber #1 and Robber #2) entered the office and "announced a robbery."  Trial Transcript ("Tr.") at 422.  The robbers were accompanied by John Lucas, an employee of Erra Metals, who had been working on the first floor of the shop.  Robber #2 had a gun to Lucas's back.

The robbers pushed Lucas into a chair located in front of Erra's desk.  Erra was forced into the chair behind the desk. Robber #1, who was standing "two inches away" from Erra, asked where the money was located.[1]  Tr. at 423-24.  After Erra produced some cash, the robbers pressed him for more money.  As this occurred, Erra was "looking right at [Robber #1]."[2]  Tr. at 425.  When Erra informed the robbers that he had no more money, Robber #1 stated:  "I know you got more money than this" and "[w]e might have to execute you right here."  Tr. at 426.  The robbers then pushed Erra and Lucas into a bathroom located in the rear of the office, shut the bathroom door and pushed a desk against the door to prevent the two men from escaping.  In total, Erra was able to observe the robbers for "[a]round ten minutes." Tr. at 426.  By the time Erra and Lucas were able to break out of

---

[1]  At trial, Erra identified Robber #1 as defendant.

[2]  According to Erra, the lighting in the office, which consisted of "two neon lights, eight foot neon lights four bulbs, one across," Tr. at 416, was "very bright," Tr. at 425.

the bathroom, the robbers had already fled.


**(2)**

**The Investigation**

Erra immediately called the police.  After arriving at Erra Metals, the police conducted an investigation of the premises. The police then took Erra to the 114th precinct in Queens.  Erra described Robber #1 to police as a six-foot tall "lighter" "male black," weighing approximately two hundred thirty pounds.  Tr. at 432-33, 483.  It should be noted that Detective Alfred Tricarico, who testified at trial, did not recall ever interviewing Lucas. Tr. at 742.

At the precinct, Tricarico gave Erra four photo-books of mugshots to examine.  Each book contained between seventy and one hundred photos of individuals from the surrounding area who had previously been arrested "sometimes for robbery . . . or other violent crimes and other felonies."[3]  Tr. at 747.  Photos of individuals arrested for non-violent crimes were also sometimes placed in the photo-books.[4]  Erra selected a mugshot of defendant from the fourth book that he looked at.  The mugshot of defendant

---

[3] Both at trial and in the briefs submitted to this court, these photo-books are often referred to as the "photo array."  This terminology is incorrect.  Photo arrays ordinarily involve a much more limited number of photographs (likely five or six) and are analogous to a lineup using photographs instead of actual persons.

[4] There was conflicting testimony at trial about whether the photo-books were broken down by race.

originated from a 1988 arrest, and eventual conviction, for harassment.

On December 23, 1992, Tricarico visited defendant's last known address in the "Astoria Houses" housing projects. There, Tricarico spoke to defendant's father, James Wilson. Wilson told police that his son was "out of town;" according to Tricarico, Wilson was uncooperative during the interview. Tr. at 803, 813.

After speaking with James Wilson, Tricarico filled out a wanted card for defendant.[5] On January 9, 1993, Tricarico returned to the "Astoria Houses" projects to look for defendant, but was unsuccessful. At some point between the end of December 1992 and January 20, 1993, Detective Tricarico again interviewed defendant's father.[6] According to Tricarico, Wilson was again uncooperative. Wilson told police that he had not seen defendant and did not know of defendant's whereabouts. On January 20, 1993, Tricarico closed the investigation. Tricarico was unable to discover the identity of Robber #2.

On October 27, 1994, defendant was arrested, along with

---

[5] A wanted card is used when police are unable to locate a certain individual. If the person on the wanted card is then arrested somewhere else in the city, the officer who filed the card is notified and can then go to interview the individual. Tr. at 725-26.

[6] There was conflicting testimony from both Detective Tricarico and James Wilson regarding exactly when this interview took place. At one point, Tricarico stated that the second interview occurred on January 9, Tr. at 808; however, at other points during his testimony, Tricarico stated that the second interview occurred on January 20, Tr. at 726-27, 809. James Wilson denied that the police interviewed him on January 20, Tr. 838, insisting that the police returned "about a week later," Tr. at 838-39.

4

Bernard Garrett and seven other men at a construction site.  The

men, part of a "coalition" organized to get work for minorities

in the construction industry, were charged with attempted "grand

larceny (extortion), menacing with pipes," unlawful entry and

unlawful assembly.  Petitioner's (Petr.'s) Aug. 31, 2005 brief,

Ex. A.   The charges against the men were all dismissed, but

defendant remained in police custody due to the wanted card that

been filed by Tricarico.  On October 28, 1994, police asked Erra

to come to the precinct to view a six-person lineup; Erra picked

defendant out of that lineup.  Defendant was subsequently charged

with first and second-degree robbery.


### (3)

### The Trial

In fall of 1995, defendant was tried before a jury in New

York State Supreme Court.  Justice Charles LaTorella presided

over the trial.  Defendant was represented by Frank GaNun, who

had been retained by defendant after GaNun had represented him in

an earlier matter.  Prior to trial, the court held a <u>Sandoval</u>

hearing and determined that if defendant took the stand, the

prosecution would be allowed to introduce a 1986 drug possession

conviction and a 1989 harassment conviction.  Although the court

barred the prosecutor from inquiring about prior arrests that did

not result in conviction, the court made clear that this ruling

would not govern any character witnesses called by the defense.

In his opening, GaNun argued that Erra had misidentified defendant and that the police had conducted no investigation.[7] GaNun also argued that defendant, who was active and visible in the community at the time of his arrest, was not hiding from police. At the end of GaNun's opening, the prosecutor objected, arguing that GaNun's attack on the adequacy of the police investigation had opened the door to Erra's initial identification from the photo-books ("initial identification"), which ordinarily would be inadmissible under New York State law. At the time, the court reserved decision on this issue, but noted that "if you ask those questions [about the police investigation] on cross-examination, I think you will have opened the door." Tr. at 392.

The State's first witness was Erra. It must be noted that when Erra failed to show up to testify on the first two days of trial, the trial court issued an order and a material witness warrant directing Erra to appear.[8]

---

[7] GaNun stated that "we will show that there was no investigation conducted here. No investigation at all." Tr. at 306.

[8] On Monday, the first scheduled day of trial, Erra told the prosecutor that he was unable to come in because he had hurt his back the previous day. Later, in attempting to locate Erra, the prosecutor called Erra Metals. The prosecutor spoke to an individual who identified himself as Erra's brother; the prosecutor believed that this individual was, in fact, Erra. That individual informed the prosecutor that Erra was in Lenox Hill Hospital. When the prosecutor contacted the hospital, they had no record of a Roger Erra being admitted. On Wednesday, when officers arrived at Erra Metals at two in the afternoon to execute the warrant, they found Erra, who came, voluntarily, to court. When Erra was brought into court, Justice LaTorella noted that Erra

On direct examination, Erra testified about the day of the robbery and the descriptions of the two robbers that he gave to police. The prosecutor's questioning then turned to the October 28, 1994 lineup. Erra testified that he picked defendant out of a lineup in October 1994. Erra also made an in-court identification of defendant. At no point, however, did the prosecutor ask any questions about Erra's initial photographic identification on the day of the robbery.

On cross-examination, GaNun questioned Erra about the police investigation[9] and then probed Erra's identification of defendant[10]. GaNun questioned Erra's recollection of the robbery, inquiring whether Erra was concentrating on the gun that was pointed at him or on Robber #1, who was not holding the gun. Tr. at 467. Erra testified his attention was on both because they were only two feet apart from each other, Tr. at 467, but did admit that he was "scared" and "frightened" during the robbery.

_____

was "having difficulty walking," Tr. at 357 and was "in obvious pain," Tr. at 371. When asked by the court if he feared testifying, Erra responded that his "only fear . . . is somebody knowing my home address." Tr. at 370. On cross-examination, Erra testified that he had injured his back on Sunday, making it unable for him to come to court on Monday. Tr. at 455. Erra also testified that he was at his place of business on Tuesday with his brother. Erra denied ever impersonating his brother in speaking to the prosecutor. Finally, Erra testified that he was at Lenox Hill Hospital early Tuesday morning.

[9]  Erra asked whether the police (1) had Erra draw a diagram of the premises, (2) took any photographs of the crime scene, or (3) questioned a witness who had seen a Nissan near Erra Metals on the day of the robbery.

[10]  When asked "what made [the robber] so peculiar to you that you could claim an identification?", Erra responded, "[h]is facial features, I mean structure of the face, roundness." Tr. at 484.

Tr. at 477. GaNun also asked Erra about defendant's appearance, focusing on the baseball cap worn by Robber #1 in an attempt to show that Robber #1's face was partially obscured and to question Erra's memory of the robbery.[11] GaNun also asked general questions about the phenomenon of misidentification,[12] some which attempted to show that Erra believed that all black persons appear similar.[13] It must be stressed that GaNun did not, at any point during his questioning of Erra, ask questions suggesting that defendant's appearance at trial was inconsistent with the description given by Erra to the police.[14]

---

[11] GaNun asked Erra whether he could remember if the hat had any insignia on it. Tr. at 465. Erra responded that he did not notice any insignia on the hat. Id.

[12]
> Q: Now, sir, are you a, in your lifetime, have you ever had an occasion where you mistook somebody for someone other than who they are?
>
> A: No.

Tr. at 462.

> Q: Mr. Erra, did, were you ever misidentified by anyone in your lifetime?
>
> A: No.

Tr. at 463.

[13] Erra responded "no" when GaNun asked, "[w]ould you say that [Robber #1] looked like a thousand other black men?" Tr. at 483. Erra did admit that he had heard the expression "[t]hey all look alike." Tr. at 495-96.

[14] That fact, and the lack of any argument by GaNun during either his opening or summation on this point, give rise to the clear inference that defendant's appearance did not conflict with description given by Erra to police. As noted previously, Erra described Robber #1 to police as a six-foot tall "lighter" "male black," weighing approximately two hundred thirty pounds. Tr. at 432-33, 483.

GaNun also questioned Erra as to why he initially failed to show up to testify, including asking Erra whether he had been threatened and whether he feared defendant.  Although Erra admitted that he had not been threatened, he testified that he feared reprisals from defendant.  At the conclusion of GaNun's cross-examination, Justice LaTorella ruled that Erra's initial identification was now admissible in light of GaNun's questions about the police investigation.

On re-direct examination, the prosecution proceeded to question Erra about the initial identification.  On re-cross, GaNun further probed Erra's identification, questioning whether the hat worn by Robber #1 obscured Erra's view of Robber #1's face.[15]  GaNun also showed Erra six photographs, which were later identified by defense witnesses as being of defendant.  Erra identified defendant in four of the six photographs.  Some of the photographs of defendant apparently were published in a local Queens newspaper; Erra denied ever reading that newspaper.  Erra testified that he had never seen defendant previously in the

_____

[15]  GaNun asked Erra to describe the manner in which Robber #1 was wearing the hat.  Tr. at 579.  Erra responded that brim of the hat was turned forward and was situated about one-and-a-half inches above Robber #1's eyes.  Id.  It should also be noted that in questioning Erra about the 1994 lineup, GaNun elicited the fact that the men in the lineup were not wearing hats.  When GaNun asked whether a "person's appearance is changed by the fact that they are wearing or not wearing [a hat]," Erra replied "not necessarily."  Tr. at 474.

community.[16]  GaNun also questioned Erra further about his failure

to show up at trial and introduced the material witness warrant

into evidence through Erra.

After Erra finished testifying, the State called Officer

Michael Singer and Detective Tricarico.  On direct examination,

Officer Singer testified about the lineup.  On cross-examination,

GaNun introduced the arrest report of defendant's 1994 arrest

through Officer Singer.  The report detailed the various crimes

that defendant and the other men were charged with.  Detective

---

[16]

    Q: Now, sir, is it possible that in selecting a photograph
on December 22, 1992, that you were selecting a photograph of
someone you may have seen in the neighborhood?

A: No.

Q: It's not possible?

A: No.

Q: Impossible . . . . is that correct?

A: Nobody I've seen in the neighborhood.

Q: It's no one you've ever seen in the neighborhood?

A: No.

Tr. at 613 (overruled objection omitted).

    Q: Is it possible that you might have seen [defendant] in
another place, and then thought you recognized him when you
see his picture in the mug book?

A: No.

Tr. at 617

    Erra was also allowed to Erra ask if he had "ever heard of a process
called "unconscious transference?"  Tr. at 615-16.  Erra responded that he had
not.

Tricarico testified during direct examination about the investigation into the robbery, as well as GaNun's initial identification of defendant from the photo-books.

During GaNun's cross-examination of Tricarico, Justice LaTorella expressed, at sidebar, concerns about some of the decisions made by GaNun. The court asked GaNun if he had "a strategy in this trial which encompasses the things that have been done so far". Tr. at 755. After GaNun replied that he did, the court noted that (1) there was no indication from defendant that he was not satisfied with GaNun's representation and (2) GaNun's "possible strategy could be this is the wrong man; what they did is they went after the usual suspects and he's one of the usual suspects, but he didn't do this . . . . [and] [t]hat is a possible strategy and it might well be valid," Tr. at 757.

After Tricarico's cross-examination concluded, the prosecution, which had put on three days of testimony, rested.[17]

The first witness called by the defense was James Wilson, defendant's father. James Wilson testified that he lived with defendant in an apartment in the "Astoria Houses" housing projects. According to James Wilson, he told officers on December 23, 1992 that defendant was "working out of town" with "his friend Joe Gold" in "Pennsylvania somewhere" and that he

---

[17] Lucas did not testify at trial. At the time of trial, Lucas was no longer in New York. Tr. at 460. According to Erra, Lucas had relocated to the South after his father died. Id.

hadn't seen defendant "in two or three days." Tr. at 838, 840, 842. James Wilson also testified that when police returned to interview him again approximately a week later, he told them that he had not seen or heard from defendant and repeated that defendant was working out of town.

The defense also called Bernard Garrett, president of a "coalition" that attempts to "get work for minorities in the construction industry." Tr. at 849. Garrett testified that he, along with defendant and seven other men, was arrested on October 27, 1994 at a construction site after the group attempted to get a contractor to hire members of the coalition. GaNun elicited from Garrett that he was charged with attempted grand larceny, menancing and grand larceny by extortion, and that all of the charges were dismissed.

The defense then called Joseph Isaac as an alibi witness. Isaac testified that at the time of the robbery he was working in Pennsylvania with defendant. Issac testified that, starting in November 1992 and ending in February 1993, he would pick defendant up every weekday morning[18] and that the two men would drive out to Pennsylvania, returning around eight in the evening. According to Isaac, he would pick Wilson up at defendant's residence on Vernon Boulevard near the Queensbridge housing

---

[18] The robbery occurred on December 22, 1992, a Tuesday.

projects, not in the "Astoria Houses" projects.[19]  Isaac also
testified that, at the end of the day, he would either drop
defendant off on Vernon Boulevard or at the "Astoria Houses"
projects.  Isaac admitted that he never went to the police with
his alibi, stating:  "I didn't know I had to."  Tr. at 924.

The final defense witness was Carolyn Younger, who knew
defendant for over fifteen years and worked with Black Families
International, a community organization.  When asked what role
defendant played in that organization, Younger responded that
"George Wilson is a role model for young adults."  Tr. at 930.
Justice LaTorella gave GaNun, _sua_ _sponte_, an opportunity to
strike that testimony, which GaNun declined.  Younger then
continued, testifying about defendant's various community efforts
and explaining why he was a role model.  After that testimony,
Justice LaTorella gave GaNun another opportunity to strike
Younger's answer.  GaNun responded that "it's not up to me to
strike my own question."  Tr. at 933.  Younger also testified
about defendant's visibility in the community.

On cross-examination, the prosecution asked Younger if she
was aware that defendant had been convicted of Criminal
Possession of a Controlled Substance (a class D felony)[20] in 1986

---

[19]  Erra Metals is located near both the "Astoria Houses" projects and
the Queensbridge housing projects.

[20] In relation to this offense, the prosecution also asked the following
questions:

and of a harassment violation[21] in 1989.  Younger was also asked

about a 1983 arrest for assault and criminal possession of a

weapon.[22]  Younger testified that she aware that defendant had

been in "trouble with the law," Tr. at 941-42, and had "contact

with the Criminal Justice System," Tr. at 943, but did not know

---

Q:  Miss Younger, do you know whether in 1986, the defendant
was arrested and eventually convicted of Criminal Possession
of a Controlled Substance; do you know, did the defendant
tell you that he was arrested with twenty-eight tinfoil
packets of cocaine on him?

A:  I am not aware, but I do believe you asked that question
before.  And added something else to it.

Q:  That's a different question.

THE COURT:  Why don't you just – were you aware?

A:  No, I'm not aware, your Honor.

Tr. at 957-58 (overruled objections omitted).

   [21] In relation to the violation, the prosecution also asked the
following questions:

Q:  Let me ask you this, because you remember him being such
a role model in the community.
     Do you remember him coming up to you and telling you
that he was arrested and charged in a crime where the
complaining victim stated stated that he forcibly removed the
gold chain from her neck, hit her in the face with his fist,
causing injury, do you remember that?

Q:  Miss Younger, do you remember that?

A: I don't remember anything about the whole incident, but I do
remember him coming saying that he was being charged with something
that he didn't do.  But the specifics of it, I don't really remember.

Q:  And he was charged with something that he didn't do and pled
guilty to anyway?

A:  No, I don't recall him saying that he pled guilty to it.  I
remember him saying what he was accused of, that he didn't do it.

Tr. at 949-50 (overruled objection omitted).

   [22] Younger testified that she was not aware of this arrest.
Tr. at 959.

specifics about any charges.

On October 4, 1995, the jury, after two days of
deliberations,[23] found defendant guilty of second-degree robbery,
in violation of New York Penal Law Section 160.10.  Defendant was
acquitted of the first-degree robbery charge.  On November 15,
1995, the petitioner was sentenced to an term of imprisonment of
seven-and-one-half to fifteen years.

**(4)**

**Post-Trial Proceedings in New York State Court**

In October 1998, defendant filed a CPL section § 440 motion
with the trial court alleging that he received ineffective
assistance of counsel.  The trial court denied that motion on two
separate occasions; first, in a brief order dated November 30,
1998, and later, in five-page order dated November 22, 1999.  In
November 1999, defendant appealed to the Appellate Division,
Second Department, arguing that he received ineffective
assistance of counsel and that the evidence at trial was
insufficient to establish guilt beyond a reasonable doubt.[24]
In a Decision and Order dated May 30, 2000, the Appellate

---

[23] During deliberations, the jury requested that the testimony of Erra
and Detective Tricarico be read back.  Because the court reporter was not
available, due to Yom Kippur, the court had the jury deliberate for over a day
without the benefit of the readbacks.  The jury returned a verdict before the
court reporter became available, and, therefore, never received the readbacks.

[24] Defendant had originally filed a notice of appeal on November 22,
1995.

Division affirmed defendant's conviction.  People v. Wilson, 272 A.D.2d 633, 709 N.Y.S.2d 415 (2d Dep't. 2000).  The court addressed defendant's ineffective assistance claim in one sentence, noting simply that "defendant's contention that he was denied the effective assistance of counsel is without merit.  Id. (citing People v. Beneveto, 91 N.Y.2d 708, 697 N.E.2d 584, 674 N.Y.S.2d 629 (1988)).  Defendant then sought leave to appeal to the New York State Court of Appeals; that request was denied on November 27, 2000.  People v. Wilson, 95 N.Y.2d 940, 744 N.E.2d 152, 721 N.Y.S.2d 616 (2000) (table case) (Ciparick, J.).

**(5)**

**The Instant Petition**

Defendant filed the instant habeas corpus petition pro se pursuant to 28 U.S.C. § 2254, raising six grounds for relief, including ineffective assistance of counsel.  A Report and Recommendation issued by Magistrate Judge Robert M. Levy on January 17, 2003 ("first R&R") recommended denying defendant's petition.  The first R&R was adopted on May 27, 2003.  In respect of the ineffective assistance of counsel claim, the first R&R concluded that "although defense counsel made a number of tactical decisions that, in hindsight, might be considered ill-conceived, this court is not prepared to hold that those errors 'were so serious that counsel was not functioning as the

'counsel' guaranteed by the Sixth Amendment.'" First R&R at 18

(citing <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)). The

first R&R also concluded that even if counsel's performance was

constitutionally deficient, petitioner failed to show prejudice,

the second prong of the <u>Strickland</u> test, noting that

> [a]t trial, petitioner faced persuasive evidence of
> his guilt. Erra, the victim and the primary
> witness, positively identified Wilson as the
> robber, having testified that he observed the
> perpetrator in his brightly-lit office during the
> commission of the crime for more than ten minutes,
> at times from two or three inches away.

<u>Id.</u> The first R&R also noted the contradictions in the testimony

of James Wilson and Joseph Isaac.

On January 22, 2004, the Second Circuit granted Wilson a

certificate of appealability. On January 5, 2005, the Second

Circuit vacated the denial of Wilson's petition. <u>Wilson v.

Mazzuca</u>, 119 Fed. Appx. 336 (2d Cir. Jan. 5, 2005). In analyzing

defendant's ineffective assistance of counsel claim, the Second

Circuit held that it was "'unable to assess with confidence

whether strategic considerations accounted for' certain acts or

omissions by defense counsel that had the effect of substantially

strengthening the state's otherwise weak case." <u>Id.</u> at 337. The

Second Circuit remanded the case to "afford Wilson's trial

counsel the opportunity to explain his actions." <u>Id.</u>

The petition was referred to Magistrate Judge Levy for a

second Report and Recommendation ("second R&R"). Magistrate

Judge Levy appointed pro bono counsel to represent petitioner. On July 13, 2005, a hearing was held before Magistrate Judge Levy in which GaNun was questioned about his conduct at trial. On June 30, 2006, Magistrate Judge Levy issued the second R&R, which recommended granting defendant's petition. On August 4, 2006, the State filed a timely objection to the second R&R.

## Discussion

### (1)

### Burden of Proof

The burden of proof ordinarily rests on habeas petitioners to prove their claims by a preponderance of the evidence. Bellezza v. Fischer, No. 01-CV-144, 2003 WL 21854749, at *10 (E.D.N.Y. Aug. 6, 2003) (citing Harned v. Henderson, 588 F.2d 12, 22 (2d Cir. 1978), a pre-AEDPA case, and noting that "[n]othing in the AEDPA revisions changes this burden"). Petitioner contends that, in remanding this case "to afford Wilson's trial counsel the opportunity to explain his actions," Wilson, 119 Fed. Appx. at 337, the Second Circuit shifted the burden to "GaNun and the State" to show that "GaNun's challenged actions were the product of a reasonable trial strategy," Petr.'s August 31, 2005 brief at 5. That argument is not persuasive. Absent a clear direction from the Second Circuit on this point, there is no reason to shift the burden in this case. Furthermore,

petitioner's argument that "GaNun and the State" now bear the burden makes little sense in light of the fact that GaNun is not even a party to this litigation.

## (2)

### Ineffective Assistance of Counsel Under Strickland

In order to prevail on a Sixth Amendment ineffectiveness claim, a petitioner must prove (1) that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "[S]trategic choices made by counsel after thorough investigation . . . are virtually unchallengeable," and there is a strong presumption that counsel's performance falls "within the wide range of reasonable professional assistance." Id. at 689-90.[25]

The second prong of the Strickland test ("prejudice" prong) requires the court to determine whether, but for counsel's deficient performance, "there is a reasonable probability that .

_____

[25] One district court has suggested that by demanding that that "all of counsel's significant trial decisions . . . be justified by a sound strategy" the Second Circuit significantly raised "the bar" in ineffective assistance cases by appearing to "require an unrealistic degree of perfection in counsel." Shepherd v. Portunda, No. 99-CV-1866, 03-MISC-0066, 2003 WL 22964538, at *5 (E.D.N.Y. Nov. 10, 2003) (citing Eze v. Senkowski, 321 F.3d 110, 136 (2d Cir. 2003)). The Second Circuit's remand order in this case cited to Eze and appears to require such an exacting standard.

. . the result of the proceeding would have been different," 466
U.S. at 694, for an "error by counsel, even if professionally
unreasonable, does not warrant setting aside the judgment of a
criminal proceeding if the error had no effect on the judgment,"
id. at 691. A defendant must show more than that the
unprofessional performance merely "had some conceivable effect."
Id. at 693. To satisfy the "reasonable probability" test,
however, "a defendant need not show that counsel's deficient
conduct more likely than not altered the outcome in the case."
Id.

The purpose of the Sixth Amendment guarantee of "the
Assistance of Counsel," U.S. Const. Amend. VI, is to ensure that
defendants receive "the assistance necessary to justify reliance
on the outcome of the proceeding," Strickland, 466 U.S. at
691-92. Thus, "[t]he benchmark for judging any claim of
ineffectiveness must be whether counsel's conduct so undermined
the proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result." Id. at
686. Just as "a verdict or conclusion only weakly supported by
the record is more likely to have been affected by [counsel's]
errors," id. at 696, "where there is overwhelming evidence of
guilt, even serious errors by counsel will not warrant granting a
writ of habeas corpus," Gersten v. Senkowski, 426 F.3d 588, 611
(2d Cir. 2005) (citing Lindstadt v. Keane, 239 F.3d 191, 204 (2d

Cir. 2001)), <u>cert. denied</u>, 126 S.Ct. 2882 (2006).

**(3)**

**Standard of Review Under AEDPA**

When reviewing a habeas corpus petition by a prisoner

challenging a state court conviction, federal courts apply a

deferential standard of review under the Antiterrorism and

Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), to any

claims that were adjudicated on the merits by the state court.

Relief may only be granted when the state court decision "was

contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of

the United States."  28 U.S.C § 2254(d)(1).

> For a state court to unreasonably apply clearly
> established federal law under AEDPA, it is not
> enough that a federal court concludes in its
> independent judgment that the relevant state-court
> decision applied clearly established federal law
> erroneously or incorrectly.  Rather, some increment
> beyond error is required.  This increment, however,
> need not be great; otherwise habeas relief would be
> limited to state court decisions so far off the
> mark as to suggest judicial incompetence.

<u>Eze v. Senkowski</u>, 321 F.3d 110, 125 (2d Cir. 2003)(internal marks

and citations omitted).[26]  "When a state court fails to articulate

---

[26]  Petitioner does not contend that the New York State ineffective
assistance of counsel standard cited to by the Appellate Division is "contrary
to" the federal standard under <u>Strickland</u>.  Although some Second Circuit
decisions have suggested that the New York standard is, in fact, contrary to
the federal standard, those decisions have declined to overturn prior Second
Circuit precedent holding that the New York State standard is not contrary to
<u>Strickland</u>.  <u>See</u> <u>e.g.</u>, <u>Henry v. Poole</u>, 409 F.3d 48, 68-71 (2d Cir. 2005).

21

the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." Eze, 321 F.3d at 125 (quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

Petitioner's ineffective assistance claims were decided on the merits; however, federal review must focus on the ultimate decision of the New York state courts because they "fail[ed] to articulate the rationale underlying" the denial of petitioner's claim. The May 30, 2000 Appellate Division decision clearly decided this issue on the merits. That brief opinion, however, did not explain the court's decision. Furthermore, although it is unclear if the trial court rejected defendant's ineffective assistance claim on the merits,[27] even if the trial court did, its discussion was conclusory and presented no specific findings or reasoning concerning the individual acts of allegedly ineffective

---

[27] On two separate occasions, the state trial court rejected petitioner's ineffective assistance of counsel claims. First, in a brief order, the court rejected defendant's motion to vacate, concluding that "sufficient facts appear on the well-documented record of these proceedings for the Appellate Division to determine whether trial counsel's alleged missteps and omissions deprived defendant of meaningful representation." Resp.'s Aff. in Opp., Ex. G (Nov. 30, 1998 Order). In a later five-page order, the trial court again rejected defendant's motion to vacate. Resp.'s Aff. in Opp., Ex. H (Nov. 22, 1999 Order). Although, in the second order, the trial court appeared to address the merits of petitioner's ineffective assistance claim, the court also stressed (1) that defendant's "claims relate to matters on the record that can be raised on direct appeal" and (2) that defendant was improperly using a motion to vacate as a method of appeal. Id. at 3-5.

representation.  As such, federal review in this situation would

ordinarily be focused on whether the state court's "ultimate

decision" denying petitioner's ineffective assistance of counsel

claims was an "unreasonable application of clearly established

Supreme Court precedent."  <u>Eze</u>, 321 F.3d at 125 (internal marks

omitted).

It is, however, unclear whether deference is still

appropriate under AEDPA once a federal court has conducted an

evidentiary hearing and elicited new evidence that was not before

the state court.  The Second Circuit has not answered this

question.  <u>See</u> <u>Rodriquez v. Miller</u>, No. 00-CV-3832, 2004 WL

3567978, at *7 (E.D.N.Y. Nov. 24, 2004) ("the Second Circuit has

yet to determine whether AEDPA deference can apply to

determinations rendered by a federal habeas court that considers

evidence that was not before the trial court."), <u>rev'd on other</u>

<u>grounds</u>, 439 F.3d 68 (2d Cir. 2006), <u>vacated</u>, --- U.S. ---, 127

S. Ct. 1119 (2007).  In <u>Rodriquez</u>, the district court considered

documentary evidence submitted by the government that was not

presented in state court.  In light of this new evidence, the

district court elected to review the habeas petitioner's claim <u>de</u>

<u>novo</u>.  <u>Id.</u>

The Eleventh Circuit has noted the competing arguments on

this issue.

> The argument as to why § 2254(d) might not apply in
> certain instances in which a federal evidentiary

23

hearing [is held] is premised in sound
practicality.  If the federal evidentiary hearing
uncovers new, relevant evidence that impacts upon a
petitioner's claim(s) and was not before the state
court, it is problematic to ascertain how a federal
court would defer to the state court's
determination.  That is, the new, relevant evidence
was never before the state court so it never
considered the impact of the evidence when denying
relief, and there is arguably nothing to defer to.

In contrast, the argument that a federal
evidentiary hearing does not alter the federal
standard of review is as follows.  AEDPA places a
highly deferential standard of review in habeas
cases and provides that habeas relief "shall not be
granted with respect to any claim that was
adjudicated on the merits in State court
proceedings" unless certain conditions are met.
28 U.S.C. § 2254(d).  The words "shall" and "any"
are powerful words and render AEDPA applicable to
all claims raised in a habeas petition regardless
of whether a federal evidentiary hearing is held.
After all, AEDPA itself dictates under what
circumstances a federal evidentiary hearing can be
held. See 28 U.S.C. § 2254(e). A petitioner's
habeas claim, even if subject to a proper federal
evidentiary hearing, is still "any" claim for the
purposes of § 2254(d)'s highly deferential standard
of review, and the new evidence in the federal
proceeding is considered in determining whether the
state court reached an unreasonable determination.

LeCroy v. Secretary, Florida Dept. of Corrections, 421 F.3d 1237,

1263 n.30 (11th Cir. 2005) (ultimately not deciding this issue

because the outcome would have been the same under either de novo

or deferential review), cert. denied, 126 S.Ct. 1458 (2006).

Both the Seventh and Fifth Circuits have concluded that

deference is still required under section 2254(d) when a district

court holds an evidentiary hearing.  Matheny v. Anderson, 377

F.3d 740, 747 (7th Cir. 2004) ("[O]ur case law is clear in

24

holding that § 2254(d) is applicable even though the district court held an evidentiary hearing. The evidence obtained in such a hearing is quite likely to bear on the reasonableness of the state courts' adjudication but we do not see why it should alter the standard of federal review.") (internal quotation marks, citations and ellipsis omitted)); Valdez v. Cockrell, 274 F.3d 941, 946-47, 951-52 (5th Cir. 2001) ("Where a district court elects, in instances not barred by § 2254(e)(2), to hold an evidentiary hearing, the hearing may assist the district court in ascertaining whether the state court reached an unreasonable determination under either § 2254(d)(1) or (d)(2)."). But see Monroe v. Angelone, 323 F.3d 286, 297-298 (4th Cir. 2003) (holding that "AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on Brady material that has surfaced for the first time during federal proceedings.")

In the instant case, the evidence elicited at the July 13, 2005 hearing is relevant solely in deciding whether, under the first prong of Strickland, GaNun had strategic reasons for his decisions at trial. As such, in analyzing Strickland's first prong, a de novo standard of review is appropriate.[28] None of the

---

[28] Ultimately, there is likely little difference in the result under either approach, as even the circuits that have refused to review such determinations de novo have still noted that any new evidence presented at a hearing in federal court is relevant to determining the reasonableness of the earlier state court adjudication. Matheny, 377 F.3d at 747; Valdez, 274 F.3d at 946-47, 951-52. Thus, if any critical evidence is elicited at a federal

evidence elicited at the hearing, however, is relevant to the determination of <u>Strickland</u>'s prejudice prong. The question of whether or not GaNun had strategic reasons for his actions, which was the focus of the hearing, is irrelevant in deciding whether GaNun's actions prejudiced defendant. That question turns solely on a searching review of the trial transcript, which reveals what evidence was presented by the State, its strength and the strength of any defense case. Petitioner does not contend that GaNun failed to present evidence that was not part of the original trial record. Rather, petitioner argues that GaNun introduced (or opened the door to) evidence that competent counsel would not have allowed into evidence. As such, any prejudice created by GaNun's actions can be determined by examining the trial record. Therefore, in order for petitioner to prevail under <u>Strickland</u>'s second prong, he must show that it would have been unreasonable for a State court to determine that he was not prejudiced by GaNun's actions.

---

evidentiary hearing, it would be difficult to show that the prior state court decision, which did not have the benefit of such evidence, was, nonetheless, reasonable.

**Analysis under <u>Strickland</u>**


**a. The first <u>Strickland</u> prong**

Petitioner points to five incidents that occurred at trial
in arguing that GaNun's representation fell below the objective
standard of reasonableness mandated by <u>Strickland</u>.  The second
R&R concluded that these acts, individually, were unreasonable,
and that, in the aggregate, they rose to the level of
constitutionally deficient representation.  To a great extent,
the findings of the second R&R regarding the first <u>Strickland</u>
prong are correct.  Although GaNun provided explanations for some
of his actions, those explanations were, in most instances,
contradicted by other testimony that he gave at the hearing or by
his actions at trial.

In analyzing GaNun's testimony, the fact that almost ten
years elapsed between the trial and the 2005 hearing must be
taken into account.  Moreover, it does not appear that GaNun
reviewed the trial transcript before the hearing.  <u>See</u> July 13,
2005 hearing transcript (H.) at 86 ("I haven't read the
transcript but I would assume that that would be the position
we'd take.").  Respondent must bear some of the blame for this
apparent lack of preparation.  At points during the hearing,
GaNun was unable to recall certain basic facts, such as which

witnesses were called by the defense.[29]  Similarly, at times

during the hearing, GaNun relied solely on the trial transcript,

having little, if any, independent, or even refreshed,

recollection of the trial.  At other points during the hearing,

however, GaNun testified at length about various issues in the

trial.

It cannot be said that GaNun had no strategy at trial.

After the trial court questioned GaNun's effectiveness at trial,

---

[29]  The following exchange, in which GaNun fails to recall three of the
four defense witnesses called at trial, takes place two pages into the
transcript of GaNun's examination at the hearing.

> Q:  Do you recall how many witnesses for the defense you
> called at Mr. Wilson's trial?
>
> A:  Not offhand.
>
> Q:  Do you recall calling James Wilson, who was Mr. Wilson's
> father?
>
> A:  Yes.
>
> Q:  Do you recall Bernard Garret who was a member with Mr.
> Wilson of a job coalition?
>
> A:  Sir, if it's in the record, then I obviously I called
> him.  I can't say or swear exactly how many witnesses I
> called.
>
> Q:  Do you remember calling an alibi witness?
>
> A:  Well, the alibi would have been the father, as I recall.
>
> Q:  And did you also call the man by the name of Joseph Isaac
> as an alibi witness?
>
> A:  I don't recall.
>
> Q:  Do you recall calling a witness named Carolyn Young
> [sic]?
>
> A:  I don't recall

H. at 10-11.

GaNun provided the following outline of his tactics in this case.

> We have no unorthodox strategy. It's a strategy
> based on the fact that Mr. Erra made a mistake.
>
> I am also trying to show the police officer
> witness here today the photograph that Mr. Erra did
> select was a photograph that was kept in the book
> after Mr. Wilson here was convicted of a violation
> of harassment.
>
> It's our position that that photograph never
> should have been in that book, that it was selected
> helter-skelter, and it resulted in an improper
> selection here today.

Tr. at 759-760. Clearly, GaNun's primary strategy was
misidentification. Tr. at 993, H. at 18, 77-78. Any actions
calculated to further that strategy are "virtually
unchallengeable." Strickland, 466 U.S. at 690. GaNun also
pursued other strategies, arguing that the police conducted an
inadequate investigation, Tr. at 993, and that petitioner was
visible in the community both before the crime (suggesting that
Erra may have recognized him from the community), H. at 20, and
after the crime (suggesting that defendant was not hiding), Tr.
at 1016. GaNun also argued that the police were not justified in
placing a wanted card in petitioner's file. H. at 28, 90.

Nevertheless, GaNun is ultimately unable to explain how four
of the five specific actions challenged by petitioner fit into
any of these broad strategies. In a number of instances, GaNun
failed to explain how the specific decision he was being
questioned about furthered any one of his strategies. Similarly,

29

in reviewing both the trial record and the hearing transcript, it appears that GaNun's actions often stemmed from a failure to understand the relevant law and the trial court's rulings.  To the extent that GaNun's decisions were not "conscious" or "reasonably informed," it is difficult to characterize those decisions as "strategic."  See Pavel v. Hollins, 261 F.3d 210, 218 n.11 (2d Cir. 2001) (collecting cases).

### i.  Opening the door to petitioner's prior convictions

Petitioner argues that GaNun inadvertently opened the door to his criminal history by allowing defense witness Carolyn Younger to testify about his reputation in the community. Because GaNun failed to understand, despite warnings from the court, that his questioning of Younger would open the door to petitioner's criminal history, his actions, in this regard, were unreasonable under Strickland's first prong.

Prior to Younger testifying, Justice LaTorella warned GaNun that questions about petitioner's reputation in the community would open the door to his prior convictions.  Furthermore, after Younger testified about petitioner's reputation, Justice LaTorella gave GaNun two opportunities to strike her testimony. Not only did GaNun refuse the court's offer, but he remarked, "it's not up to me to strike my own question."  Tr. at 933.

At the hearing, GaNun explained that it was his intention to

elicit reputation testimony because he wanted to show that
defendant was innocent and that he was "was a good man, who was
trying to do something for his people in that community and that
he was active in the community."  H. at 19-20.  <u>See</u> <u>also</u> H. at
23, 26.  According to GaNun, he declined to strike the reputation
testimony because he wanted testimony stating that petitioner was
"a role model in the community."  H. at 26.

Because GaNun apparently intended to elicit reputation
testimony through Younger,[30] the critical question becomes whether

_____

[30] It should be noted, however, that the following exchanges suggest
that GaNun may have proceeded without a clear understanding of exactly what
purpose Younger would serve at trial.

> Q:  So, was Ms. Younger a character witness or was she not a
> character witness?
>
> A:  Do I have to say right now what she was or what we
> expected her to be?  We expected her to testify that she knew
> Mr. Wilson and that Mr. Wilson, as far as she was concerned,
> was a reputable person in the community.  That was it, you
> know?  And again, you're dealing with a jury and if anything
> is positive for your client, you try to get it in.  Anything
> negative, you try to knock it out.  If in doing so you have
> to take a position that was the position we took.
>
> Q:  So now you're testifying here today that she was put on
> as a character witness?
>
> A:  I'm testifying I don't know what she put on for, you
> know?

H. at 34.  The following exchange occurred soon thereafter.

> Q:  So, was it your position that Ms. Younger had not
> testified as to Mr. Wilson's character?
>
> A:  Listen, all I am going to say is whatever's in the record
> I'll stand by the record.  If that's what you interpret it to
> be, so be it.  But you have to understand we're going - it's
> an ongoing situation.  It's like an argument between myself,
> the Court and the district attorney was less argumentative.
> The Court was most argumentative.
>
> Q:  I understand.  Let's move on. . . .

GaNun was aware that, as a result of introducing that testimony, petitioner's prior convictions would necessarily become admissible.  See People v. Kuss, 32 N.Y.2d 436, 443, 299 N.E.2d 249, 253, 345 N.Y.S.2d 1002, 1007 (1973) ("When [the credibility of character witnesses] is at issue, it is well established that they may be asked as to the existence of rumors or reports of particular acts allegedly committed by the defendant which are inconsistent with the reputation they have attributed to him."). There is conflicting evidence from both the trial record and from the hearing transcript on this point.  At trial, GaNun did not initially object to the admissibility of defendant's prior convictions during the prosecutor's cross-examination of Younger, suggesting that he understood that defendant's prior convictions would be admissible.  Tr. at 941-51.  Ultimately, however, the following exchange provides persuasive evidence that GaNun did not understand the consequences of eliciting (and not striking) Younger's reputation testimony.

> Q: So was it part of your strategy then to elicit
> testimony from Ms. Younger that was going to open
> the door to Mr. Wilson's criminal history?
>
> A: I think that the issue of opening the door had
> preceded that.  The Court had talked about that I
> had 'opened the door' in my opening statement when
> I made a reference to the fact that the police
> investigation --
>
> Q: No, I think we're talking about the photo array

---

H. at 36-37.

> there, Mr. GaNun.  <u>What I'm asking is whether you called Caroline Younger with a trial strategy in mind of opening the door to Mr. Wilson's prior criminal record?</u>
>
> A: <u>No, I would say that I had no intention of doing that.  If it happened, it happened</u>.

H. at 106 (emphasis added).  What makes this testimony particularly compelling is that it occurred on re-direct examination by petitioner's counsel after both sides already had an initial opportunity to question GaNun about this issue.[31]

At other times throughout the hearing, GaNun's testimony suggested that he did not understand that eliciting reputation testimony would inexorably lead to defendant's criminal history becoming admissible.  <u>See</u> <u>Cave v. Singletary</u>, 971 F.2d 1513, 1524-1527 (11th Cir. 1992) (finding ineffective assistance of counsel where attorney "was confused about and misunderstood a

---

[31] The following exchanges occurred during cross-examination by respondent's counsel.

> Q:  And you were aware that if you had brought forth a character witness identifying Mr. Wilson as a "peaceful man," the prosecution might be able to bring in evidence of his prior arrest.
>
> A:  Yes.

H. at 79.

> Q: And you know, you knew that asking Ms. Younger about Mr. Wilson's activities as a role model for young adults in this community organization could possibly open the door to his prior criminal history.
>
> A:  Yes.

H. at 81.  The above question were leading.  Yet, even aided by those suggestive questions, GaNun still gave a contradictory answer later during re-direct examination.

fundamental legal concept . . . and constructed a theory of defense based on [that] erroneous belief").  At one point during the hearing, GaNun admitted that he didn't know what the court was driving at when Justice LaTorella asked him if he wanted the testimony stricken.[32]  Moreover, no explanation was provided at the hearing for a number of perplexing comments made by GaNun. See Tr. at 930 ("I certainly [don't want the question stricken]. I know the D.A. does"); Tr. at 933 ("For the record, it's not up to me to strike my own question.").  Additionally, at the hearing, GaNun stated "you're dealing with a jury and if anything is positive for your client, you try to get it in.  Anything negative, you try to knock it out."  H. at 34.  That statement suggests a fundamental misunderstanding of the evidentiary mechanics of reputation testimony.  Once reputation testimony was elicited, there was no chance that GaNun would be able to "knock out" defendant's criminal history.  Furthermore, any misunderstanding of the law on this point is inexcusable given that the trial court explained the consequences of calling a

---

[32]
    Q:  Did you realize, Mr. GaNun, what it was that the Court was driving at when he asked you whether you wanted to strike that testimony?

    A:  No.

    Q:  Did you realize that the judge was saying that this would open the door to Mr. Wilson's criminal record?

    A:  Probably.

H. at 28.  When asked to elaborate on that answer, GaNun gave a confusing and rambling explanation.

character witness during the <u>Sandoval</u> hearing.[33] Tr. at 20-21.

Furthermore, GaNun was unable to explain why, after not objecting to the prosecutor's initial questions about defendant's prior convictions, he later decided to object to questions about defendant's criminal history. During the cross-examination of Younger, Justice LaTorella requested defendant's "rap sheet" and asked the prosecutor what other incidents he intended to question Younger about. Tr. at 952. After the court explained that the prosecutor could explore "another felony" (which presumably referred to defendant's 1983 arrest for assault and weapons possession), GaNun objected, arguing (1) that defendant had not taken the stand,[34] (2) that Younger was not a character witness[35]

---

[33]  At the <u>Sandoval</u> hearing, the court stated,

> D.A., I'm going to preclude you from using everything except the following. If the defendant takes the stand, you may ask him whether or not he was convicted. You may, of course, mention and proffer, if necessary, whether he was convicted of quote, a serious crime unquote, on the sentence date, which is February 3rd of '87, I think. You may ask him that.
>
> <u>Now, obviously this only goes to Sandoval at this time. I mean if the question of his, an alleged proclivity of violence, if there's a character witness who says he's a very peaceful man, that's another story.</u>
>
> <u>I won't preclude the use of these arrests and all the reports and everything else you have, I would hear the D.A. at that point. It depends on what he wants to say on the stand, what he doesn't stay on the stand, how it comes up.</u>

Tr. at 20-21 (emphasis added).

[34]  When asked at the hearing "what difference did it make if [defendant] had taken the stand?", H. at 33, GaNun provided the following puzzling response.

> Well, at that stage, we're having a situation, a rolling

35

and (3) that it was the responsibility of the prosecutor to object to Younger's testimony. Tr. at 954. It is difficult to understand the logic of these arguments. At the hearing, GaNun was unable to explain the purpose of or reasoning behind this objection, which made little sense in light of GaNun's earlier conduct during the cross-examination.[36]

Even if it is assumed that GaNun's actions and decisions concerning Younger's testimony were conscious and not the result of errors and unreasonable misunderstandings of the trial court's rulings (or annoyance at the trial court), it is unlikely that GaNun properly weighed the risks of his "strategy." GaNun's

_____

> argument with myself and the Court and I was objecting to the
> Court's rulings at what that - this particular case, if he
> hadn't taken the stand, maybe that shouldn't come in. The
> Court overruled my argument and that was - so be it. The
> Court overruled it.

H. at 33.

[35] GaNun implied that Younger was not a character witness because she testified beyond the scope of his question on direct examination, which was "what role did [defendant] play in your organization." Tr. at 930. In arguing his objection, GaNun stated, ""I asked the question and the question was what was [petitioner's] role in the community? The witness started to go off." Tr. at 954.

[36] Because GaNun relied on the defendant's failure to testify, both petitioner and the second R&R contend that GaNun confused the trial court's instructions regarding reputation testimony by Younger with the court's earlier ruling at the <u>Sandoval</u> hearing. That theory could potentially explain, but would not excuse, GaNun's actions. Justice LaTorella explicitly stated that his <u>Sandoval</u> ruling would not apply to character witness testimony. Tr. at 20-21. GaNun's conduct was unreasonable if he elicited the reputation testimony believing that the 1983 arrest would not be admissible. The 1983 arrest, which involved a weapons charge, was arguably more similar to the 1992 robbery than either the 1986 drug possession conviction or the 1989 harassment conviction. As such, if GaNun believed that the court's <u>Sandoval</u> ruling applied to Younger's testimony, it cannot be said that his decision to elicit reputation testimony was a reasoned trial strategy because he would have been unable to properly weigh the risks of eliciting reputation testimony without realizing that defendant's 1983 arrest would become admissible.

testimony at the hearing suggests that he believed that it was always appropriate to elicit reputation testimony.[37] Such a categorical and inflexible approach implies that GaNun never weighed the risks of eliciting reputation testimony in this particular trial.

### ii. Opening the door to Erra's initial identification of defendant.

Petitioner contends that GaNun was ineffective when he opened the door to the admission of the initial photographic identification that occurred on the day of the robbery. Once the initial identification became admissible, the prosecution was able to show that Erra not only identified defendant in a lineup in 1994, but also identified him hours after the robbery occurred. It is undisputed that, unlike under federal law, New York State law would have barred the prosecution from introducing evidence of the initial identification if GaNun had not opened the door by questioning the adequacy of the police investigation.

---

[37] At the hearing, GaNun testified that "[i]f it was going to be for his benefit, I would try to elicit it." H. at 23. In addition, the following exchange took place at the hearing.

> A: In my defense of Mr. Wilson, <u>as in any criminal defendant, if you get a witness, any witness, to say that the guy is a good guy, it's worth putting him on.</u>
>
> Q: Okay. That was your strategy?
>
> A: That was the strategy.

H. at 82 (emphasis added).

It appears that GaNun's conduct in this regard was the result of
failing to comprehend Justice LaTorella's instructions, and, as
such, was not the product of a reasoned or conscious trial
strategy.

In his opening statement, GaNun attacked the adequacy of the
police investigation into the robbery.  Relying on those
statements, the prosecutor argued that GaNun had opened the door
to the admission of the photo array.  Justice LaTorella denied
the prosecutor's request, but told GaNun that if he were to ask
questions about the adequacy of the investigation "on
cross-examination, I think you will have opened up the door but
I'll rule on it when I get to it."  Tr. at 392.  Although the
court ostensibly reserved decision on this issue, it is clear
that the court was likely going to allow the initial
identification into evidence if GaNun broached the adequacy of
the investigation on cross-examination.

Despite the warning from the court, GaNun proceeded to
cross-examine Erra about the adequacy of the police
investigation.  Tr. at 460-61; 470-73.  Once GaNun's cross-
examination had concluded, Justice LaTorella called counsel to a
sidebar concerning the admissibility of the initial
identification.  The court noted the various questions GaNun had
asked concerning the investigation.  Tr. at 500.  In response,
GaNun argued that he did not open the door because (1) "the

statement 'poor investigation' doesn't relate to anything about photographic identification" and (2) that his questions about fingerprinting and a car at the scene had nothing to do with the issue of photographic identification. Tr. at 508-09. The court rejected those arguments, concluding that GaNun had opened the door to the admission of the initial identification. The prosecutor was then allowed on re-direct examination to question Erra about the initial identification.

At the hearing, GaNun gave conflicting explanations for his conduct. At certain points during the hearing, GaNun testified that he intended for the initial identification to be admissible. H. at 94-97; H. at 62 ("I had no problem with the photo array [coming into evidence]"). That testimony, however, is belied by both GaNun's initial cross-examination of Erra, which did not include any questions about the initial identification, and GaNun's later attempt to bar the prosecution from asking about the initial identification on re-direct examination by arguing that the "door wasn't open." Tr. at 508.

GaNun appears to have simply misunderstood the trial court's warning about opening the door to the initial identification. As such, it cannot be said that GaNun pursued a reasoned strategy in attacking the adequacy of the police investigation, when he was unaware of the risks inherent in that line of questioning. At the hearing, GaNun testified that he thought only questions about

the initial photographic identification would open the door to the initial identification. H. at 60. Given the court's specific direction on this issue, it cannot be said that GaNun's error was either excusable or reasonable. Furthermore, GaNun's other relevant testimony at the hearing is difficult to follow and betrays a failure by GaNun to understand the relevance of the initial identification.[38]

In arguing that GaNun's actions were strategic, respondent points to GaNun's decision to confront Erra with photographs of petitioner, some of which Erra failed to identify. That questioning, which occurred during re-cross and was likely a tactic to mitigate the damage caused by the introduction of the initial identification, does not illustrate that GaNun was aware that questions about the police investigation would open the door to the initial identification.[39]

### iii. Admitting the 1994 arrest report into evidence

Petitioner attacks GaNun's decision to introduce an un-

_____

[38] At one point, GaNun implied that the photo identification was not a major issue, stating "[they] took a picture of him when he was arrested [in 1988]. So what." H. at 58. Of course, the admission of the initial identification did not merely inform the jury that the police had previously photographed petitioner; the jury also became aware that Erra had identified the photograph of petitioner hours after the robbery while Erra's memory of the event was fresh.

[39] Due to scheduling issues, GaNun's re-cross of Erra occurred five days after the prosecution's re-direct examination. Given this lapse of time, there is no clear inference that GaNun prepared the photographs prior to the initial identification becoming admissible.

redacted copy of the police complaint report ("report") concerning petitioner's 1994 arrest.  The report stated that the suspects "did attempt grand larceny (extortion), menacing with pipes . . . unlawfully enter[ed] construction site . . . [and] unlawfully assembled at construction site."  Petr's Aug. 31, 2005 brief, Ex. A.  When GaNun asked to have the report admitted, the court questioned his decision, but ultimately allowed him to proceed.[40]

Because the admission of the report was a conscious decision and did not stem from a misunderstanding of the court's rulings, it is possible that GaNun had a trial strategy on this point.  At the hearing, GaNun offered a number of justifications for his decisions; however, none of those reasons were coherent or relevant to the facts of Wilson's case.

At the hearing, GaNun explained that he "was trying to show

---

[40]

> The Court:  I'm going to ask the defense, do you really want this in evidence.
>
> GaNun:  Absolutely.
>
> The Court:  All right.  It's your choice.  You're not asking for redaction or anything else?
>
> GaNun:  No, your Honor.
>
> The Court:  That's not a problem as long as we all fully understand what we're doing here, I'm sure you do, I'm not going to ask you what your theory of defense is.
>      All I'm going to say to you is, I would not let the jury see this in ten million years unless you specifically wanted it.  It's as simple as that.

Tr. at 662.  The court also noted the report was "of such a nature that I want defense to think twice before they put it in."  Tr. at 663.

to the jury that . . . [the 1994 arrest] was for want of a better word baloney because all of these guys were trying to do was get jobs for people in the community." H. at 87-88. GaNun pursued a similar argument in his closing argument. Tr. at 1005-06. Illustrating defendant's good character could be a viable strategy; however, evidence of defendant's involvement in the coalition was provided by Garret, making it unnecessary for GaNun to use the report to show GaNun's good character.

GaNun also intimated at the hearing that by admitting the report and exploring the background of the arrest, he was "[t]rying to 'be honest with jury' . . . . [and to] [g]ive the appearance of 'being honest with jury.'" H. at 88; see also H. at 90 ("our position was one of being open to the jury"). It is unclear exactly how the jury would have known that GaNun was being "honest" with them because it is unlikely the jurors would have known that the report would ordinarily be inadmissible.

In attempting to explain his decision to admit the report, GaNun also testified at the hearing that he believed that the police did not have sufficient justification to place the wanted card, which "popped [up]," Tr. at 19, after the 1994 arrest, in petitioner's file. H. at 77-78 ("Our defense was that the incident took place two years prior, that he was picked up out of a wanted situation that I believe that never should have happened because it was bogus, in my opinion."). GaNun believed this was

a valid theory because the only evidence against defendant was Erra's initial identification. According to GaNun, that was insufficient in light of (1) a police investigation limited to two attempts to interview petitioner's father, and (2) the fact that defendant's photo, which was from his harassment arrest, was placed in a photo-book with convicted robbers.

It is difficult to understand how the admission of the un-redacted report is at all relevant to this strategy. Furthermore, this theory is utterly incomprehensible.[41] First, it is irrelevant that petitioner, who had never previously been convicted of robbery, had his photo placed in a photo-book with convicted robbers. If anything, this would seem to be a poor police tactic because it would appear to lower the chances of Erra identifying the robbers, if the robbers were, in fact, repeat offenders. Second, Erra's initial identification of defendant was clearly sufficient justification to place the wanted card in defendant's file. Third, the question of whether the wanted card should have been placed in defendant's file was completely irrelevant to the jury's determination of whether defendant was guilty of the 1992 robbery. Even if the jury believed that the wanted card should not have been placed in

---

[41]  In analyzing GaNun's argument, this court is cognizant that in presenting a defense, or in some cases numerous defenses, defense counsel may advance arguments before the jury, which, although not perfectly logical, may be still be persuasive enough to create reasonable doubt in the minds of jurors. However, contrary to GaNun's belief, it is highly unlikely that based on this theory "a reasonable person would say there's doubt," H. at 89.

defendant's file, that in no way alters the fact that Erra
identified defendant in the photo-book, in the lineup and at
trial.  To the extent that GaNun's decision to admit the report
was based on this "strategy," it cannot be said that such an
approach constitutes effective representation.

At trial, GaNun used the report to question Officer Singer
about the time defendant was arrested, in an apparent attempt to
impeach Officer Singer's credibility.  That strategy, however,
could have been pursued using a redacted copy of the report,
which omitted the description of alleged crimes committed by
defendant.  More importantly, at the hearing, GaNun did not
discuss the impeachment issue in justifying his decision to
introduce the report.

Finally, even if GaNun had a reason for admitting the
report, it is unclear that GaNun grasped the potential
prejudicial effect of linking defendant to allegations of prior
threatening and violent activity.  According to GaNun, there was
"nothing prejudicial about" the report.  H. at 45-46.  <u>see</u> <u>also</u>
H. at 87-88 (denying that "having the complaint admitted was
prejudicial").  Based on that testimony, none of the "strategies"
proffered by GaNun at the hearing can be deemed reasonable.


**iv.  Defendant's mugshot**

After the court determined that the initial identification

44

was admissible, the prosecutor questioned Erra about the photo-books. During the questioning, the prosecutor referred, three times, to the photos in the books that Erra viewed as "mug shots." Tr. at 530. When asked, Erra identified the photo of petitioner from the photo-book, which was introduced into evidence. That "photo" actually consisted of two different "shots" of petitioner, one facing front and the other a profile angle. Petr's Aug. 31, 2005 brief, Ex. B; Tr. at 540. In the "shot" with defendant facing forward, there was a placard in front of defendant with identifying information that is ordinarily found in mugshots.

During voir dire involving the photo, the court remarked, "there is no way that this jury is going to see the plaque in front of the defendant's body showing a number NYCPD; that's out, that's going to be redacted." Tr. at 536-37. The court also informed GaNun, "I might remind you that you didn't object when the Prosecution used the word, 'mugshot.' I would have sustained the objection." Tr. at at 540. GaNun responded that "[u]nfortunatley, I probably didn't hear the word, "mugshot." Id. GaNun then objected to both "shots" being admitted into evidence, arguing that allowing the jury to see both of the "shots," taken from different angles, made it clear that the photo was a mugshot. Id. The court denied GaNun's request, noting that the term "[m]ugshot" was already in the record. Tr.

45

at 541. The court then asked GaNun if he wanted to have the placards redacted from the photo; GaNun declined that offer and the photo was admitted without the placard being redacted. Tr. at 542.

At the hearing, GaNun offered the following explanation for his actions: "[i]t was another issue that we had with the Court. We had made the objection to the photograph initially. We had the quote exception for appellate purposes and it was like okay, let's get on with the case in chief." H. at 66-67. GaNun's testimony on this point is puzzling. If the redaction issue had been in dispute, it may have been strategic not to press what was a minor issue as there was already friction between GaNun and Justice LaTorella. However, the fact that the court offered to redact the photo makes it difficult to understand GaNun's behavior. It appears from the trial record that GaNun, who had just had his objections overruled, was simply being obstinate with the court. Given the offer to redact the photos, GaNun's actions were not reasonable.[42]

---

[42] Although there is an extensive discussion of <u>Strickland</u>'s prejudice prong <u>infra</u>, it should be noted that there was little, if any, prejudice created by GaNun's errors in refusing to redact the photo and in failing to object to the term "mugshot." Even absent those errors, the jury would almost certainly have known, based on common experience, that the photo was a mugshot, especially given the fact that the trial court refused GaNun's request to have one of the photo angles redacted. <u>See</u> <u>Batten v. Griener</u>, 97-CV-2378, 03-MISC-0066, 2003 WL 22284187, at *13 (E.D.N.Y. Aug. 26, 2003) (granting habeas petition on other grounds, but finding that petitioner was not appreciably prejudiced when "trial counsel failed to redact his arrest photograph" because "[a]lthough some trimming would have made the exhibit look less like a mug shot, nothing would prevent a typical juror from recognizing that the front-on and side-view shots were arrest photographs").

### v. GaNun's questioning of Erra concerning his fear of defendant

Petitioner argues that it was unreasonable for GaNun to ask Erra whether he feared petitioner because GaNun should have known, from earlier testimony, that Erra would testify that he feared petitioner. In this respect, GaNun's questioning of Erra was not unreasonable because it was unclear from Erra's prior testimony how he would respond.

During GaNun's cross-examination of Erra, the following exchange occurred.

> Q:  Did you have any fear to testify in this case?
>
> A:  Yes.
>
> Q:  And what was that fear?
>
> A:  I fear for my family, I fear for myself.
>
> * * * *
>
> Q:  Now, from 1992 till today, have you been threatened in any manner?
>
> A:  No.
>
> Q:  Now, sir, since October 28, 1994, have you been threatened in any way?
>
> A: No.

Tr. at 492. GaNun then asked the following:

> Q: Were you in fear of this defendant, George Wilson?
>
> A: Yes.
>
> Q: And why were you in fear of this defendant, George Wilson?

A: Reprisals.

Tr. at 492-93.

Prior to Erra taking the stand, he was asked by the court, during questioning related to the material witness warrant, "whether he had any fear of being a witness." Tr. at 370. Erra responded that his only fear was "somebody knowing my home address." Tr. at 370. A transcript of that testimony was provided to GaNun. Tr. at 379.

At the hearing, GaNun testified that he believed there was a possibility that Erra would testify that he was did not fear reprisals from defendant. H. at 99-100. Although that possibility seemed unlikely given Erra's earlier testimony, it is not so far-fetched, given the vagueness of Erra's earlier testimony, to be completely unreasonable. Courts must not "use hindsight to second-guess [defense counsel's] strategy choices." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

At the hearing, GaNun explained that he wanted to show that Erra was an "unwilling" witness" and a "was a puppet of the police." H. at 71. GaNun also wanted to show that Erra's fears of defendant were unfounded because he had not been threatened in any way. H. at 72. Because GaNun's questions were asked in furtherance of these strategies, it cannot be said that those

questions constituted ineffective assistance of counsel.[43]

With the exception of GaNun's questioning of Erra concerning reprisals, GaNun's disputed trial decisions were unreasonable. His actions were not the result of considered and reasoned strategy, but rather stemmed, in large part, from his inability to comprehend both the trial court's rulings and critical facts in the case, as well as his unhappy relationship with Justice LaTorella.  To the extent that GaNun offered explanations at the hearing, even taking into account the passage of time and GaNun's failure to review the trial record prior to the hearing, those explanations were generally irrelevant to the specific issue he was being questioned about or were contradicted by other testimony at the hearing and his actual conduct at trial.


**b.  The prejudice prong of <u>Strickland</u>**

<u>Strickland</u>'s prejudice prong requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result at trial would have been different.  466 U.S.

---

[43] It must be noted that GaNun's errors in questioning Erra were unlikely to have prejudiced defendant, whose case turned on whether the jury accepted the misidentification defense.  Erra feared defendant solely because Erra believed that defendant was one of the robbers.  As such, the jury would only believe that Erra had a valid basis for fearing George Wilson if the jury rejected the misidentification defense.

at 687, 694.  "In ruling on ineffective assistance claims, the
Second Circuit has emphasized the strength of the Government's
case against the defendant." Wade v. U.S., No. 97-CV-4439, 1998
WL 43110, at *4 (S.D.N.Y. Feb. 2, 1998) (collecting cases); see
also United States v. O'Neil, 118 F.3d 65, 73 (2d Cir. 1997)
(holding that petitioner failed to show prejudice where there was
"overwhelming evidence" of his guilt at trial).

Even if GaNun had not committed any of the errors outlined
above, there is not a "reasonable probability that, but for
counsel's unprofessional errors, the result at trial would have
been different."  Stated differently, even if defense counsel had
presented a mistake-free defense, it is not reasonably probable
that petitioner would not have been found guilty.  Although the
Second Circuit characterized the State's case as "weak," the
evidence against petitioner was, in fact, strong.[44]  Critically,
Erra was able to view the perpetrators at close range for almost
ten minutes under bright lighting.  See Merrell v. Workman, No.
CIV-05-1318-M, 2006 WL 687058, at *6 (W.D. Okla. March 17, 2006)
(adopting magistrate judge's report and recommendation that

_____

[44]  The Second Circuit's decision to order an evidentiary hearing did
not constitute a final determination of the prejudice prong.  In remanding the
case, the Second Circuit relied on the liberal standard for granting
evidentiary hearings in ineffective assistance of counsel cases.  Wilson, 119
Fed. Appx. at 337 (citing Sparman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998)
(per curiam) ("We believe that a district court facing the question of
constitutional ineffectiveness of counsel should, except in highly unusual
circumstances, offer the assertedly ineffective attorney an opportunity to be
heard and to present evidence, in the form of live testimony, affidavits, or
briefs.")).

concluded petitioner failed to show prejudice where the "two eyewitnesses provided consistent and solid identifications of [p]etitioner as the robber both at the time of his arrest and during trial, and their testimony reflects that they had adequate opportunity to view the [p]etitioner from a close distance").

Furthermore, petitioner does not argue that GaNun's cross-examination of Erra regarding his identification constituted ineffective assistance of counsel. In testing, and attempting to impeach, Erra's identification of defendant, GaNun performed competently, adequately exploring the appropriate issues on cross-examination. Despite these various attempts by GaNun to undermine the identification, Erra did not waver in his insistence that petitioner was Robber #1.

Moreover, significantly, Erra provided consistent descriptions of the perpetrators to police. While Erra's initial description of the robbers to the police was not extremely detailed, it was reasonably accurate as to height, weight` and skin-color; nothing in the record suggests that Erra's description conflicted, in any way, with petitioner's actual appearance. In contrast, the Second Circuit has found prejudice where the defendant had a "strong" defense of misidentification based on the fact that the eyewitness, who was able to view the perpetrator at close range for an extended period, gave an initial description that diverged significantly from the

defendant's actual appearance. <u>Henry v. Poole</u>, 409 F.3d 48, 66

(2d Cir. 2005), <u>cert. denied</u>, 126 S.Ct. 1622 (2006). In <u>Henry</u>,

the defendant, who was arrested three weeks after the robbery in

question, was four inches taller, forty pounds heavier and had a

different hairstyle than the description given by the victim.

Furthermore, the victim described the perpetrator as having a

gold tooth, a clear distinguishing mark. When arrested, the

defendant in <u>Henry</u> had no gold tooth; there was also testimony

that the defendant never had a gold tooth. Erra's strong and

consistent identification is not comparable to the dubious

identification in <u>Henry</u>.

In sum, although (1) there was no physical evidence

connecting defendant to the scene, (2) defendant made no

inculpatory statement and (3) and Erra's identification was

cross-racial,[45] these factors, even taken together, would not have

---

[45] Concerns about the cross-racial nature of Erra's identification are assuaged by the extended time Erra had to view the perpetrators. A meta-analysis of thirty-nine studies of cross-racial identifications noted that the amount of time that a subject is able to view a target appears to affect the accuracy of cross-racial identifications, with a shorter "study time" increasing the number of erroneous identifications. Christian A. Meissner & John C. Brigham, 7 <u>Psychol. Pub. Pol'y & L.</u> 3, 24 (2001) ("Although the application of the laboratory-based term 'study time' to the crime situation may be forced, it should be noted that many crimes involving eyewitnesses occur in a matter of seconds (e.g., assaults, murders, some robberies). This short period of time would involve very limited 'study time' for the eyewitness, hence increasing the chances of subsequent false alarms (i.e., mistaken identifications) in cross-race situations.").

Moreover, not only was there no testimony concerning the reliability of cross-racial identifications presented to the jury, but the extent of Erra's contact with black persons was never explored at trial. Given the location of Erra's business (in addition to the fact that Lucas, Erra's employee, was black), one could easily speculate that Erra had numerous interactions with black persons. Finally, and more importantly, the jury, which had at least

created a reasonable doubt given the evidence against petitioner. In light of Erra's strong identification that was based on a ten-minute opportunity to see the robbers and that was not undermined on cross-examination, there is not a reasonable probability that the outcome of the trial would have been different absent GaNun's errors. Ultimately, one cannot defeat something with nothing, especially when the nothing is a weak alibi with no supporting evidence.

The second R&R suggested that Erra's failure to show up at trial for two days and subsequent explanation cast doubt on his credibility. Second R&R at 36 ("Erra . . . initially failed to come to court and may have lied to the prosecutor to avoid testifying."). This argument is unpersuasive. Erra's alleged dishonesty to the prosecutor was easily explained by his fear of reprisals.[46] Furthermore, Erra firmly believed that defendant was Robber #1. Given that Erra had no prior knowledge of, or interaction with, defendant, there was little motive for Erra to lie on the stand.

The second R&R also questioned the 1994 lineup because the five fillers at the lineup may have been "older [than defendant]

---

two African-Americans on it, Tr. at 239, was apparently not persuaded by GaNun's arguments on this issue, Tr. 1001-03.

[46] Even if GaNun did not elicit this fact from Erra during cross-examination, the jury would still have learned on direct that Robber #1 had threatened to "execute" Erra and Lucas during the robbery, raising the inference that Erra may have feared testifying. Notably, the prosecutor raised this point during his summation. Tr. at 1036.

as they 'were [all] veterans living in a veterans shelter.'"
Second R&R at 36 n.18 (citing Tr. at 697-98).  Officer Singer
testified that he focused on finding people who were similar in
appearance to defendant, but did not concentrate on their ages.
See Tr. at 697 ("I really don't go by age").  This point was not
pressed at trial and, as we do not have the photograph, the
significance of any age difference can not be assessed.[47]
Magistrate Judge Levy's reliance on this point is not persuasive.
While GaNun may have made mistakes during trial, he was certainly
aggressive and would have pursued this issue further if he
believed it to be of any real consequence.

In addition, petitioner's less-than-airtight alibi would be
unlikely to convince a jury that he was innocent.[48]  To the
contrary, it might well have strengthened the case against
petitioner.  The accounts of Wilson and Isaac contain
contradictions about defendant's whereabouts around the time of

---

[47] The actual ages of the fillers was never established at trial.  When
asked by GaNun whether the average age of the fillers was about ten years
older than defendant, Tr. at 697-98, Singer stated that he did not recall the
ages of the fillers in the lineup.  Although Singer admitted that he made a
record of ages of the fillers, Tr. at 698, this issue was not probed further
at trial.

Furthermore, petitioner, who bears the burden of proof, did not produce,
or explain his failure to produce, the lineup photograph.  It should be noted
that petitioner did include images of both defendant's mugshot and the 1994
arrest report in his August 31, 2005 brief.

[48]  Petitioner does not contend that GaNun was ineffective in presenting
this alibi defense.  Cf. Henry v. Poole, 409 F.3d 48, 65-66 (2d Cir. 2005)
(finding ineffective assistance of counsel where defense counsel presented an
"false" alibi that did not even cover the time period of the crime), cert.
denied, 126 S.Ct. 1622 (2006).

the robbery. If, as Isaac testified, defendant was often dropped off at night in the "Astoria Houses" projects, it is unlikely that James Wilson, with whom defendant lived, would not have seen or heard from his son for at least a week after the robbery.[49] The prosecutor stressed this point in his summation. Tr. at 1043-46. Although James Wilson may have been attempting to help out his son by being uncooperative, the fact remains that this contradiction weakens defendant's alibi. Furthermore, James Wilson testified that he told police that defendant was working with "Joe Gold." There was no testimony establishing that Isaac (whose first name was Joseph) was known as "Joe Gold." Moreover, Isaac did not come forward until trial, casting even further doubt on his testimony. The prosecutor also focused on this point in his summation. Tr. at 1046-47. It should also be noted that no other witnesses were called, or documentary evidence introduced, to corroborate Isaac's claim that petitioner was working in Pennsylvania at the time of the robbery. As such, even if GaNun did not commit any of his errors at trial, there is not a reasonable probability that the outcome of the trial would

---

[49] Petitioner's son apparently lived in the nearby Queensbridge housing projects. Petitioner asserts that "[t]hough [his] father's home was [petitioner's] residence of record, [petitioner] could have periodically stayed nearby with his son's mother." Petitioner's Second Circuit brief, 2004 WL 3960289, at *31. The only testimony supporting such an argument came from Isaac, who testified that he would pick defendant up near the Queensbridge housing projects. However, that does not account for James Wilson's testimony and statements to the police, explaining that he had absolutely no contact with defendant for, at minimum, an entire week after the robbery.

have been different. Notably, <u>Commonwealth v. Rossi</u>, 473 N.E.2d 708, 709-10 (Mass. App. Ct. 1985), upon which petitioner relies in arguing prejudice, involved a "plausible and well supported" alibi that was corroborated by three witnesses; the defendant in <u>Rossi</u> also introduced evidence that he had passed a lie detector test.

Despite petitioner's arguments to the contrary, the fact that the jury requested a readback of the testimony of Erra and Detective Tricarico's testimony does not suggest that this was a close case. A jury's request for testimony or a readback is not necessarily indicative of the strength of the prosecution's case. Indeed, it is this court's experience that jurors - motivated by an appreciation of their heavy responsibility in judging the guilt or innocence of a defendant - often request readbacks or transcripts even when the evidence is overwhelming. Furthermore, <u>Mason v. Scully</u>, 16 F.3d 38, 45 (2d Cir. 1994), upon which petitioner relies, is clearly distinguishable as <u>Mason</u> involved not only readback requests, but also an <u>Allen</u> charge.

Finally, even when all of the above factors are considered in the aggregate, it cannot be said that the State's case against defendant was weak. The decisions relied on by petitioner in arguing prejudice involve more serious deficiencies than the case against petitioner. For example, in <u>Mason</u>, 16 F.3d at 45, the court, in an identification case with no physical evidence,

characterized the evidence against the defendant as "not overpowering."  However, in _Mason_, the critical eyewitness, who took three minutes to identify defendant in a six-man lineup, testified to an account of the robbery that was "at odds," in material respects, with a police report.  _Id._  In contrast, Erra's identification was consistent.  Furthermore, while none of the three eyewitnesses to the robbery in _Mason_ could identify any specific distinguishing characteristic of the defendant, Erra testified that the "roundness" of defendant's face made him distinctive.  Tr. at 484.  Additionally, as noted earlier, the jury in _Mason_ reported to the court that it was "hopelessly undecided" and only reached a verdict after receiving an _Allen_ charge from the court.  _Mason_, 16 F.3d at 45.

No defense strategy, however artfully devised, could have overcome the inherent weakness in the defense's case.  Absent the problems created by GaNun's decisions and mistakes, the trial might have proceeded differently.  Sketched out below are various iterations on how the trial could have proceeded if petitioner had received perfect representation.  Under none of these approaches is it reasonably probable that the outcome of the trial would have been different.

First, the most conservative strategy would involve the defense (1) not calling any witnesses, (2) not questioning Erra about the adequacy of the police investigation and (3) not

introducing the arrest report.  Under this approach, the jury
would have heard (1) about the day of the robbery, (2) about the
resulting police investigation and interviews of James Wilson,
(3) that petitioner, at some point, for unexplained reasons,
became a suspect, and (4) that Erra identified him from a line-up
that occurred two years after the crime took place.  Given Erra's
prolonged opportunity to view defendant, his accurate description
of defendant and his unflagging insistence that defendant was
indeed one of the men who robbed him, it is not reasonably
probable that a jury would acquit on these facts a defendant who
presents no alibi and whose only defense is misidentification.
It is similarly unlikely that a jury would even fail to reach a
unanimous guilty verdict in this case.  Although a defendant does
not bear the burden of proof and is not obligated to present any
defense, it is not reasonably probable that a jury would fail to
convict petitioner, who failed to testify in his own defense or
put forth a persuasive alibi, given the evidence in this case.

Second, defense counsel could have followed a similar
approach to the first scenario, only this time, the defense would
have called either James Wilson or Isaac to provide an alibi.
However, as discussed earlier, given the weaknesses of these
alibi witnesses, it is not reasonably probable that the outcome
of the trial would have been different.

Third, defense counsel could have called the exact same

witnesses that were, in fact, called, but could have avoided all of GaNun's errors. Thus, although Younger would not have testified about defendant's reputation, she would have still been able to testify about defendant's visibility in the community, as well as defendant's involvement in her community organization. Younger's testimony, however, would have been unlikely to alter the outcome of the trial. Erra did not equivocate in his belief that he had never previously seen petitioner in the community or viewed petitioner's photograph in a local newspaper, which he did not read. Under this third scenario, Garrett would also testify, but would not be confronted with the 1994 arrest report. Garrett's testimony, however, accomplished little, other than suggesting that petitioner was not hiding at the time of his arrest. As such, it cannot be said, to a reasonable degree of probability, that even a mistake-free presentation of the defense offered at trial, would have resulted in an outcome other than a verdict of guilty.

Because petitioner is unable to show that it would have been unreasonable for a State court to determine that he was not prejudiced by GaNun's actions, the petition should be denied.[50]

---

[50] Although, as noted earlier, deferential review under § 2254(d)(1) is appropriate in analyzing <u>Strickland</u>'s prejudice prong in this case, even if reviewed under a <u>de novo</u> standard, petitioner would still be unable to show prejudice.

## Conclusion

For the reasons stated above, the petition is denied.  The Clerk of the Court is directed to close the case.

Date:  Brooklyn, NY
       March 28, 2007

                         SO ORDERED:


                         _____/s/_____
                         David G. Trager
                         United State District Judge